**Michael Frank RAWLINGS, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 3–85–215–CR.**

Court of Appeals of Texas,
Austin.

Aug. 13, 1986.

Mark E. Cusack, Chunn & Chunn, New Braunfels, for appellant.

William M. Rugeley, Criminal Dist. Atty., Linda A. Rodriguez, Asst. Criminal Dist. Atty., San Marcos, for appellee.

Before SHANNON, C.J., and EARL W. SMITH and GAMMAGE, JJ.

EARL W. SMITH, Justice.

Appellant, Michael Rawlings, was convicted by the jury of the offense of aggravated sexual assault as alleged in the indictment, which alleged that Rawlings used and exhibited a deadly weapon, to wit, a knife, in the commission of the offense. Tex.Pen.Code Ann. §§ 22.011 and 22.021 (Supp.1986). The jury also found the allegations in paragraph two of the indictment, that Rawlings had been convicted previous-ly of the felony offense of theft, were "True," and assessed punishment at confinement in the Department of Corrections for 99 years. Tex.Pen.Code Ann. § 12.-42(c) (Supp.1986). The trial court adjudged Rawlings guilty and assessed punishment as found by the jury.

Rawlings filed a motion to suppress "any photographs offered into evidence used in any pre-trial photographic line-up" and to suppress "any in-court identification of Defendant by the alleged victim who viewed an impermissibly suggestive photographic line-up of Defendant" and alleged, further:

II.

The photographic identification process by the State of Texas prior to any in-court proceedings was conducted in such a manner as to deny Defendant due process of law under the United States Constitution for the following reasons:

(a) Defendant was not represented by counsel at the time;

(b) Defendant was not personally present at the time;

(c) the alleged victim, [W.R.] at the time of the alleged incident made the basis of the charge against Defendant:

1. had a limited opportunity to view any assailant who allegedly sexually assaulted her on September 28, 1984.

2. was excited and emotional at the time of the alleged sexual assault;

3. had poor conditions in which to view any assailant who allegedly sexually assaulted her;

4. was only able to give a general description of her alleged assailant immediately after the incident;

(d) conflicts exist between the alleged victim's first description of assailant and the actual appearance of Defendant; and

(e) The alleged victim, [W.R.], had been told prior to being shown the photograph of Defendant's hand that he was a suspect.

### III.

The photographic identification proceeding was conducted in such a manner as to make it impermissibly suggestive and conducive to irreparable harm of mistaken identity.

On the date of the trial, but before the introduction of evidence, a hearing was held on the motion to suppress. At the conclusion of evidence and argument thereon, the trial court overruled the motion without making any oral or written findings of fact or conclusions of law to aid this Court on appeal—a practice suggested, but not made mandatory, by the Court of Criminal Appeals in *Martinez v. State,* 437 S.W.2d 842 (Tex.Cr.App.1969). In his motion for new trial, Rawlings contended that the trial court erred in overruling his motion to suppress.

In his first two grounds of error, Rawlings contends that the trial court abused its discretion in overruling his motion for new trial, because (1) the out-of-court photographic lineup of defendant was impermissibly suggestive and gave rise to a substantial likelihood of irreparable misidentification and (2) the trial court erred in allowing the victim's in-court identification of appellant, because such identification was tainted by the out-of-court photographic line-up and the in-court identification was not shown to be of independent origin.

In his third ground of error, Rawlings contends that the trial court erred in allowing evidence concerning the out-of-court identification because the defendant was in custody and the photographic display was conducted in the absence of counsel in violation of the defendant's rights under the Sixth and Fourteenth amendments of the United States Constitution.

In discussing appellant's grounds of error, we find that the sole method of identification of Rawlings as the person who sexually assaulted W.R., the alleged victim, was based upon a tattoo on his left hand; *i.e.,* W.R. could not, and did not, identify Rawlings in any other manner. For example, W.R. testified:

> Q. So the person that was arrested, *you could not identify except for that tatoo in that picture?* [Picture of the left hand of appellant showing the tattoo on it] [1]
>
> A. Uh-huh.

Such method of identification is conceded by the State in its brief:

> The identification of victim's assailant turned *not on facial recognition, but the identification of a tatoo that the assailant had on the web area between the thumb and forefinger of his left hand. The victim observed the tatoo during the sexual assault on September 23, 1984.*

It is further conceded by the State in its argument to the jury:

> If you believe her, then I believe you've got one choice to make, just one choice. If you believe her, the eyewitness, the person who studied the tatoo on that person's arm, she said his fingernails were well clipped. If you believe her that she saw that and she had collected her thoughts long enough to know that that was going to be important, that was her only chance and that's all it comes down to and you know that. *It all comes down to that tatoo and that was her one chance to be able to identify that person.* Don't you know she knew that was important? *She didn't look at anything else but that hand.*

(Emphasis added.)

There being no question that W.R. was assaulted, we therefore address ourselves to the controlling issue, to wit:

WERE THE OUT–OF–COURT IDENTIFICATION PROCEDURES AND METHODS BASED ON SO IMPERMISSIBLY SUGGESTIVE TACTICS EMPLOYED BY THE STATE AS TO GIVE RISE TO A SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDEN-

---

**1.** The record often spells "tattoo" "tatoo." The record will be quoted without repeatedly insert-

ing "sic."

TIFICATION; AND IF SO, WAS THE IN–COURT IDENTIFICATION OF THE TATTOO TAINTED BY SUCH PROCEDURES, OR WAS IT OF INDEPENDENT ORIGIN?

## THE SEXUAL ASSAULT AND DESCRIPTION OF ASSAILANT'S TATTOO

On Saturday night, September 23, 1984, W.R. completed her eight-hour shift as a waitress and arrived at her two-bedroom apartment (which she shared with a male roommate) at midnight. She took a shower, ate a sandwich while watching television, went to bed and fell asleep almost immediately. Since her roommate, Scott Manley, was out of town, no one else was in the apartment. At *2:00 a.m.* she awoke when someone opened her door and peeked in. The time was fixed by W.R. looking at her clock when she awoke. She asked who it was, getting a reply: "It's James." There was a dim light outside her door, which came from a table lamp in the living room. She could not see the person's face, but could determine that the person was a male. She said that "they" walked down to Scott's door and that in less than thirty seconds, "he" was back in her room.

She was groggy at first and was trying to figure out what was happening. By the time she decided something was wrong, the man was back in her bedroom, took two or three steps, approached her with a knife and "just put it in my face." She said that while he was standing next to her with the knife in her face, her attention was focused on the knife so that she did not notice any other "details" about the assailant. As the assailant had entered her room, he flipped on the overhead light switch, and the room was well-lighted thereafter throughout the assault. She was sitting up in bed when the assailant returned.

W.R. testified that the assailant had a bandana across the bridge of his nose, and wore glasses which she was unable to describe.

She noticed his hair (which she described as dark, dirty blonde hair), height, build, and blue jeans. She could not describe any facial features and said, "I didn't see any details." In her handwritten statement she described the hair as "blonde." Someone inserted the words, "dirty" and "wavy hair" so that with the insertion it appeared to read "slender, and blonde, dirty wavy hair." On the motion to suppress she said that the assailant "had dark dirty blonde hair." At her deposition, she described the hair as "dirty blonde, kind of wavy."

He told her to roll over onto her stomach, threw a pillow over her head, and then pressed on the pillow. He put his knee on her back and then cut the wire of the telephone which was by the head of her bed. Her head faced to her left toward the phone. Though the pillow was over her head, she could see out to her left. The phone cord was used to tie her hands behind her back. While looking from beneath the pillow to her left, she could only see his hands and his blue jeans—she could not see him "from the waist up." Each of her feet was tied to a bed post by the use of brassieres. At one point, before the man sexually assaulted her, she broke loose from her bonds and struggled with him for a few minutes, during which time she was facing the assailant and trying to push him away. Though she saw him when he entered the room and while facing him during the struggle, she said she did not remember if he wore a shirt. She said, "At one point during the struggle, I was pretty close to him, and I could see him briefly." After the struggle, she was re-tied. He cut strips from a pillow slip to tie her legs to the bedposts, and attempted to tie a towel around her head and to use it as a gag.

It took 15 or 20 minutes for the assailant to tie her up, after which he unzipped his pants, got over her and raped her. While she was on her stomach and he was over her back, he used his hands to support himself. Though she did not explain how she knew, he masturbated, using his right hand while supporting himself with the left hand, which was in front of her face. The pillow was not pressed down so that she was able to observe his left hand, which

was in her view during the act, *for ten minutes.* She testified that she forced herself to look at the tattoo for the entire ten-minute period so she could recognize it. The hand was only six to ten inches from her face, with nothing to obstruct her vision of it. W.R. noticed a tattoo on the back side of the assailant's left hand. The tattoo was "between his thumb and finger," she said, and indicated that it was on "a portion of the webbing of the hand between the forefinger and thumb." She was asked to describe the tattoo and said:

> It was—overall, it was a *round* form and it was *black* and it had a very *dark green border* like it was discolored. And it could have been a design, but I took it to what, I thought, resembled *letters.* And the back side, which would be the side closest to the thumb, I would say was the broadest side, a real thick part of the tatoo, the thickest part.

(Emphasis added.)

W.R. testified that the tattoo had no other colors besides *green* and *black,* and that she had never seen a tattoo "that close" before. The day after the sexual assault she wrote out a statement in her own handwriting which she took to the police station on Thursday and gave to Officer Morris. In the statement, she described the tattoo as follows:

> I noticed a tattoo on his left hand during the rape—it was between his thumb and index finger. It was black/green and was 2 initials—I think the letters were **EZ** [letters in bold black in the statement]

On cross-examination, W.R. was asked to describe the tattoo again. She said:

> Left hand, between the thumb and index finger; round shape, *black—green border.*

(Emphasis added.)

She further testified as follows:

> Q: You said the tattoo was letters. What letters were they?
>
> A: I thought the figure E with a very bold back and like a straight Z coming off the E.

She said she thought she would be able to identify the tattoo; that she had had a good enough view to do so.

Though W.R. said that the assailant touched the brass door knob to her room and to that on her roommate's door, the telephone, her purse, two jewelry boxes (nothing was taken by the assailant, however), no identifiable fingerprints were found by the fingerprint officer anywhere on the premises.

At the conclusion of the evidence at the hearing on the motion to suppress, the defendant was asked to approach W.R. at the witness stand and show his hand so she could see the tattoo. He did so, she looked at it, and said, "[T]hat's it."

At the conclusion of the hearing on the motion to suppress, Rawlings approached the bench at his counsel's request and, with the approval of the court, the following ensued:

> MR. CHUNN: Yes. Your Honor, I'm going to instruct my client to roll up his shirt sleeve on his left arm and extend his hand out to the judge for the Court to look at the tatoo and, Your Honor, *I would like for you to allow the record to reflect that there is a blue tatoo. It is not black, with a dark green border. It is not a tatoo that resembles the initials E Z It's more in the form of a diamond shape or a rectangle with a faded out area in the middle of it with a very light line extending towards the pointer finger or index finger on the hand. It does not resemble the tatoo that was described· during the initial investigation of the initial statements given by the victim to the—to other people on the night of—*or morning of Sunday, September the 23rd, 1984.
>
> *As well as noting at the very top of his arm he has another tatoo that seems to be a very intricate and elaborate design above his elbow on his upper arm. And while his hand is extended with his palm down that tatoo consumes, oh, because the shirt is in the way I can't see how far up, it looks like it goes almost—from within two and a half*

*inches of the elbow all the way up to his shoulder and consumes the entire upper portion of his arm. And I think it is very important for the Court to reflect that that is the actual description and reflect that description into the record.*

THE COURT: *All right. That's agreeable.*

MS. RODRIGUEZ [Prosecutor]: Your Honor, could I add something?

MR. CHUNN: Do you have that order, that the Judge is ordering that description be part of the record?

THE REPORTER: Yes.

MS. RODRIGUEZ: I would just like to add to the description that Mr. Chunn had just given, that the lines are not real distinct or clear and concise on this tatoo.

THE COURT: That's acceptable.

Moreover, at the trial on the merits, over the objection of counsel for Rawlings, W.R. made a similar identification of the tattoo as being the one her assailant had on his left hand:

W., please look at the hand. Try to take a good look at it.

That's it.

MS. RODRIGUEZ: Your Honor, if I would, I would ask that the defendant please go in front of the jury and have them be able to see it so they can make their own decision later on.

MR. CHUNN [Defense Counsel]: Your Honor, I'm going to want that to happen, but first I would like the defendant to place his hand on the Court's table. *And I would like the Court to reflect in the record that Michael Rawlings does, in fact, have a tatoo on his left hand. That tatoo is basically rectangular or diamond in shape.* There is a small streak leading towards his index finger and it is not—

MS. RODRIGUEZ: Your Honor, I'm going to object to the defense attorney trying to describe a tatoo. I think anyone that views it can make their own determinations of what it looks like.

MR. CHUNN: I'm asking the Court—

THE COURT: Overrule the objection.

MR. CHUNN: *Put your hand up there, Mike. We have here a tatoo that is diamond or rectangular in shape with a streak going towards the index finger. It is blue in color, it is not black with a dark green border. And it—in the center of it simply has a faded out area that is not blue, and may the record so reflect that, Your Honor?*

(Emphasis added.)

In response to defense counsel's questions, W.R. admitted that in her handwritten statement she diagrammed the tattoo and that the initials "EZ" were on the diagram. During the trial on the merits, she was asked by the State to draw the diagram again, which was admitted as State's Exhibit 6, reproduced below:

Having drawn the diagram, she was asked by the District Attorney to again describe the tattoo. She answered that it was *round*, with a *dark green border* discolored around the edges; that it "looked like letters to me instead of a design"; and "it was *black* and the border seemed discolored and seemed dark *green*."

The effect of the above is that the trial court, both on the motion to suppress and the trial on the merits, *let the record show* that the tattoo on Rawlings' left hand did not match the description given by W.R. throughout the pre-trial and the trial on the merits. She never varied in her description of the tattoo which she viewed, in the well-lighted room, for ten minutes, for the expressed purpose of being able to identify it later.

### SUGGESTIVE PROCEDURES

Following the assault, Officer Sprott took W.R. to the hospital. She testified

that while there, police officers told her that they had picked up five suspects "that were in the area." Later, she testified that she was told that four of the suspects were Mexican, that one was white and that one of the suspects was her neighbor. Officer De La Fuente told her, on the day of the assault, that of the five suspects who had been picked up, *one* had a tattoo. On cross-examination, she admitted that she did not remember what day she was told about the suspects, but that it was *before Wednesday* following the assault—probably on Monday or Tuesday. She admitted that *"by Wednesday*, she knew that the suspect lived at that *Allen Street address* [the address of Rawlings, her next door neighbor]." She further testified:

Q: So you already had [before Wednesday] a *preconceived notion* that he [Rawlings] was going—he could *possibly be one* of the people that *assaulted you*. Is that correct?

A: Uh-huh.

On cross-examination, she again said that the officers had told her they had a suspect who lived in her neighborhood, that he was white and lived on Allen Street. During the trial on the merits, she testified, in response to the District Attorney's questions:

Q: Now you said you had been told that *one* of the suspects was *one of your neighbors*. Did you know that it was *this* neighbor?

A: I knew all of the other neighbors. *So it had to be him.*

The importance of the above testimony is the statement found in the suppression hearing that on Wednesday she saw Rawlings (whose name she did not know) in his back yard, while she was looking out her roommate's window. She had seen him twice before, within the past months, "moving around his backyard while I was in my backyard." Asked why she was looking out the window on Wednesday, she said:

I had been told that one of the suspects was from the—was a neighbor and I knew that the neighbor had a green truck and I had seen the green truck outside.

[Officer Derrickson testified that in a search of the neighborhood he went to the Rawlings' residence, saw and looked into a green truck, and talked to Rawlings, who had been asleep in a hammock in the back yard. Other information he had is set out below.]

And I wanted to see if it was him so I could identify him and have him arrested.

She watched him for some time, observed that he met the "general" description of her assailant, so she wanted to see if she could see the tattoo. As he walked in his back door, "He opened his back door and he had a small object in his left hand, and he lifted his left hand up and I saw the tattoo and *then* I knew it was him." She was *seventeen feet from Rawlings* when she allegedly saw the tattoo.

After seeing the person with the tattoo, she said that she "called the police to call in a positive identification." The officers did not respond. The next day she went to the police station to ask why her neighbor had not been arrested. The officers had never taken a statement from her, so she took her handwritten statement to them. It is interesting to note that she also testified that when she saw the assailant in her room, she did not feel like she had ever seen him before and that she "*never had occasion to see him again.*"

Though she said that the person she saw in the back yard met the general description of her assailant by height, hair color, glasses (which she could not describe), weight and build, it is clear from her testimony, and the entire record, that her Wednesday identification was based on seeing a tattoo from a *distance of seventeen feet* and on conversations with officers as above related.

On *Saturday*, she was asked by Officer James to look at two pictures of a tattoo. She saw the pictures, photocopies of which are attached (State's Exhibits 1 & 2, in black and white). She testified as follows:

Q: Were you able to identify the pictures?

A: Yes.

Q: And was it a picture of the *tattoo of the man who assaulted you?*

A: *As closely as I could tell.* The pictures *weren't very good.* They were far away. I couldn't tell two *colors* of the tattoos, but ...

After testifying again that the pictures were not very good, and that "you *couldn't really tell the color,* like the tattoo was *discolored around the edge in green,* and the *photo didn't pick that up."*

Q: But you were able to positively identify them?

A: Yes, the *size,* and the *location were very similar.* Exact, I'd say.

When Officer James called her to come to the police station on Saturday, he told her about arresting someone for the offense. She was led to believe that the suspect had been arrested on Saturday. She said that she could not remember if Officer James said "that they had arrested him or picked up a suspect on the fact that he had a tattoo." She was asked "if the defendant were to show you that tattoo on his hand today, do you think—you got a good enough look at it on the night of the assault to tell the court whether or not he was the man who assaulted you?" She said that she could, that she *made herself look at the tattoo* the night of the assault, well enough to remember it so she could identify it.

W.R. testified that she was only shown *two* pictures of the same tattoo—that Officer James did not offer to show her other tattoos. On cross-examination, she admitted that, from looking at the pictures, she could *only tell the location and the size* of the tattoo. Though she requested, more than once, to see a line-up, her request was never honored, nor was she ever shown a photograph of Rawlings. She said:

Q: And before you were shown these photos, you were told this person was a suspect, is that correct?

A: Yes.

On re-direct examination she testified:

Q: Now, as far as your identification of the man who assaulted you, W., *how*

*important to you were the pictures* that were shown to you on Saturday?

A: *Not very good* at all.

Then followed her observation of defendant's hand in court and her identification of the tattoo as discussed, *supra.* On re-cross-examination, she again admitted the pictures were of poor quality. She testified:

Q: You couldn't tell who the person was by looking at these pictures, is that correct?

A: No, but the person they took those pictures of *was supposed to be the person I had identified Wednesday.*

She said:

All they wanted me to do was *identify the tattoo,* period. I identified the tattoo, period, as being *similar to the tattoo that I remembered.*

and

I told you the *location and size* were what I identified it by.

In regard to her being denied a line-up, she said:

I could not get any other way of identifying him. What was I supposed to do? All they're going to give me is pictures.

Johnny James, a detective with the police department, testified that he was out of town on the Saturday of the assault. He began his investigation of the sexual assault when he returned. On the 28th, he was given a copy of W.R.'s typed statement. (It did not include her diagram of the tattoo.) He talked to Officers Derrickson, De La Fuente, and Smith. From the victim's statement, he obtained the general description of the suspect as to height, weight, build and the victim's statement that the assailant had a tattoo on the left hand between the thumb and index finger. He questioned some of the officers, including Smith, about the tattoo. He learned that Smith had talked to Rawlings; Smith had seen the tattoo on Rawlings' hand; and that other people who lived at the residence had been talked to by other officers.

James talked to Bob Jackson, Rawlings' parole officer. Jackson told him that his records showed that Rawlings had a tattoo on his left hand. It is noteworthy that James did *not* testify that he *obtained a description of the tattoo* other than that contained in W.R.'s typed statement. Based on the above-recited information he caused an arrest warrant for Rawlings to be issued. (There is no issue of probable cause for the arrest warrant before us.) On Saturday, September 29, 1984, Rawlings was arrested, and was taken to the San Marcos police station. Apparently no search warrant of the residence on Allen Street was obtained by James or any other officer. If he searched Rawlings when he arrested him, apparently nothing was found.

James, using a Polaroid 600 camera, took pictures of Rawlings' left hand (attached as State's Exhibits 1 and 2). The pictures do not match the description contained in W.R.'s statement, nor the description of the tattoo by defense counsel dictated into the record which the court certified as being correct. Rawlings was transferred to the county jail and James called W.R. and asked her to come to the police station. He said that before he showed the pictures to her, "I explained to her that I was going to show her two *photos of the tattoos on the suspect's hand,*" and asked her if she could identify them as being "the one" that was on the hand of the assailant. He did not recall whether he told her *whose* hand it was in the picture, nor did he *recall* whether he told her that the pictures were of the hand of a person who had just been arrested; neither did he deny such.

James testified that he felt pretty certain that "they had identified the assailant" *based upon W.R.'s description of the tattoo,* her identification of the photos, and *what he had seen on Rawlings' hand.* He did not know if W.R. had told other officers that the tattoo was *round* in form. He said, "*All* I had was *her statement* at that point in time." Of course, he had *looked* at the tattoo himself. This being true, we are led to the inescapable conclusion that at the time James showed the pictures of the tat-

too to W.R., he must have known: (1) that W.R. described the tattoo as *"black/green* and was 2 initials—I think the *letters* were EZ," which is totally different from what he must have personally observed; (2) that the tattoo on Rawlings' hand was *not* black/green, but *blue* and that it did not contain or consist of the letters EZ; (3) that in her statement she described the assailant's hair as dirty *blonde wavy* hair; (4) that Rawlings' hair, as revealed by the "mug shot" at the time of arrest, is not blonde or wavy. To the contrary, it is *extremely curly all over* his head and appears to be in the nature of an "Afro" style; (5) that Rawlings had a beard around his mouth and chin, which obviously was not grown in a matter of a few days, and which was not mentioned by any officer or W.R. at any time; and (6) that the tattoo was *rectangular* in shape as he observed defendant's hand and as revealed by the pictures.

John James testified that he did not remember if he told W.R. who the suspect was; but he finally admitted telling her the pictures were of *the suspect.* Nor did he know whether he told her that the suspect had been convicted of other offenses. He said that he *may have told W.R.,* after the identification of the photos, that the suspect previously *had been charged with rape.* He said, "I would not have said that prior to any identification."

Though James did not recall whether W.R. told him the pictures were of poor quality, he admitted that "they were not as good as they could be, no sir." The pictures of the hand were not life size because he could not make a "real good close-up" with the Polaroid camera that he used. He never showed W.R. photos of anyone else's hand. Moreover, he never afforded her an opportunity to view Rawlings in person, or in a line-up with other people. He never offered, up to the time of trial, to show Rawlings' "mug shot" to her. After showing W.R. the photos, James made *no further investigation.*

On redirect, he admitted that he had a photo "mug" book at the station. He said he did not have any other tattoo pictures to show W.R., nor did he have, on September 29, 1984, a better camera, so as to be able to take "one-on-one" (life size) photos. On re-cross, he admitted that he *did* have other tattoo pictures, but said, "Well, none of the left hand."

At this point the court permitted counsel for Rawlings to let the record show the description of Rawlings' hand, as hereinabove detailed.

The State asked for, and got, permission of the court for James, during the trial on the merits, to take additional pictures of Rawlings' hand. (Black-and-white copies are attached to this opinion as State's Exhibit 3 and 4). Obviously, they do not in any way match W.R.'s description of the tattoo. As pictured, it is *not round*, is *faded in the middle*, does not appear to be in the *"webbing"* of the hand. The original exhibits show the tattoo to be *blue*, not *black* or *green*, James admitted.

During the trial on the merits, W.R. described the hair of the assailant in these words: "His hair color was *dirty blonde and it was kind of wavy.*" *Cf.* the "mug shot" (attached hereto) of Rawlings taken on Saturday following the Sunday assault. Without doubt, the distinctive, very full, very curly, head of hair could not have been grown from Sunday to Saturday.

She testified that at one point (before the culmination of the sexual assault began), she broke free from the bonds with which she was tied and started to struggle with her assailant. During the struggle she was facing him, and she "was pushing him off" and said, "I *bit* his left arm just above the elbow." Asked how she knew it was his arm, she said, "Because I *opened my eyes* during the struggle and I was *facing him* and I saw him and *I was biting his arm.*" After stating again that she bit the assailant on the arm above the elbow, she was led, by the prosecutor, into the following testimony:

Q: You don't remember whether you bit into a shirt or skin, do you?

A: I don't remember.

She admitted testifying on her deposition, however, about biting the assailant and saying, "I thought I was biting the s\_\_t out of him." She thought the bite would have *broken the skin*, and would have left a wound. She said that she bit him as hard as she could—on the left arm above the elbow. She admitted that on Wednesday, as she looked at her neighbor, she did *not* notice a bite mark on his left arm.

She also noticed that the assailant "reeked heavily" of cigarette smoke.

We observe that the in-court drawing by W.R. of the tattoo occurred after she had been shown the pictures by Officer James and after she had testified on the motion to suppress. The diagram speaks for itself: the tattoo she drew was *round, not rectangular*, and contained the letters EZ. Asked to describe the tattoo she had drawn, she continued to insist that it was "round" with a dark green border.

When she went to see Officer James on Saturday, he wanted her to look at photographs of a tattoo on a left hand. Her identification at that time was based on the tattoo being in the same location and "about the same size" as the tattoo on her assailant. In her opinion, the camera (Polaroid) was a foot or two away from the hand when the pictures were taken.

Officer Sprott testified that he was the first officer on the scene on the morning of the assault. There he met W.R., who told him what had happened. From his investigation report, he read the description W.R. gave him of the assailant: about 6 feet tall, had *dishwater blonde hair*, coughed frequently, had a strong cigarette smoke smell about him, had a red bandana over his face so that she could not see it, was white, slender and had a tattoo on his left hand between the thumb and forefinger, in the *webbing* of the left hand, and the tattoo was about the size of a nickel or a quarter.

W.R. told Sprott that the assailant *did not look familiar.* Sprott said, on cross-examination, that the description given him was general, not detailed at all, except for

the tattoo, and that the description could fit several people. He also said that W.R. told him that the assailant's hair was *collar* length, and that he had *blue* eyes. (W.R. testified that she did not know the color of his eyes.) Sprott relayed to Officer Derrickson, by radio, the description given him.

Officer De La Fuente also went to the scene. Derrickson told him what had happened. De La Fuente noticed a white male asleep in the next door yard. This officer was the fingerprint man in the department. He found partial unidentifiable prints on the telephone and on the outside of the kitchen door frame. He did not dust for fingerprints on the jewelry box, W.R.'s purse, or any of the door knobs.

Derrickson arrived at the scene about 4:00 a.m., met Sprott, gathered possible evidence (the bedsheets, two brassieres used to tie W.R.'s legs to the bed post, her night gown, etc.). After Sprott took W.R. to the hospital, Derrickson said he walked around the perimeter of the apartment building. Like De La Fuente, Derrickson noticed the man asleep in a hammock in the adjacent yard. He radioed in a message that he was going to talk to the man. He awakened the man, Rawlings, asked for his driver's license, which was produced, and found the name on it to be appellant's. Appellant was in blue jeans with either tennis or sport shoes, *wore a gold neck chain,* and wire frame glasses. Rawlings was *not wearing a shirt.* He told Derrickson that he had been asleep four to five hours. (The time of the interview is not shown.) Derrickson said that Rawlings had an undescribed tattoo on his left hand, which he noticed when Rawlings handed him the driver's license, as at the time he was using a flashlight for illumination; there was another tattoo somewhere on his arm—Derrickson did not record exactly where. Derrickson did not verify whether Rawlings was a guest at the house. Though Sprott said that he had given the description that he had to Derrickson, the latter said that he had not been told by anyone that the suspect had a tattoo. He did say that he got a very general description of the assailant from W.R.—she could not tell the color of the assailant's eyes, for example. Derrickson did not search or arrest Rawlings, who was not attempting to flee. Derrickson also testified that he "took a fairly good look" at Rawlings and *did not notice a bite mark* on his left arm, nor any noticeable wounds or blood. Rawlings also had a big tattoo on his body, but Derrickson did not notice if it was one on his chest from the collar bone down. He admitted that he did not include "a single thing" in his report about a tattoo. He did not search the green pickup truck, parked at the apartment where Rawlings was, for a weapon. He did look in the pickup but observed nothing of consequence.

W.R. delivered her handwritten statement to Officer Morris. Though he did not recall the statement, he was certain that he had read it. Finally, he admitted that W.R. did bring in a handwritten statement (offered in evidence by the defense) which he had re-typed. In the statement, Morris said that W.R. described the tattoo as being *"black and green with two initials, EZ."*

Testifying on the merits, James said that he took two photographs of the tattoo on the base of Rawlings' hand, and a "booking photo." *Never* did James say that the tattoo on Rawlings' hand was black or green or that it contained the letters EZ. Using a search warrant, he obtained a sample of Rawlings' blood, head and pubic hair, and saliva. From W.R. he obtained a head hair sample. All these items were taken to the Department of Public Safety for examination. He admitted that W.R. never personally described to him the assailant's tattoo. His knowledge of the description was obtained solely from her written statement.

Contrary to his testimony on the motion to suppress, (where he testified that he did tell W.R. that the photos he showed her were from a suspect's left hand), James said he could not recall telling her that. He did state, however, that he may have told her that the person whose hand was depicted was *under arrest.*

Having been recalled, James testified that, during trial (as permitted by the court), he took two more pictures of Rawlings' left hand (attached as State's Exhibits 3 and 4, in black-and-white). Of much importance, in connection with the last two pictures, James testified that they *do not show a tattoo with a green border,* and that the tattoo appears to be *blue,* that it is *not black,* but dark blue. James never looked to see if Rawlings had a bite or bruise mark on his left arm close to the elbow.

## OTHER EVIDENCE BEARING ON IDENTIFICATION

The State then called Mary Lou Hernandez. She and her daughter lived next door to W.R.'s apartment. Mary Lou testified that she had a close relationship with Rawlings. He was a guest in her house on the Saturday night and Sunday morning in question. Having worked at Jorge's on Saturday until 5:00 or 6:00 p.m., "they" got a cabrito for a next-day get together of Jorge's employees, and for Rawlings' birthday, which was on Sunday. Rawlings was there when she arrived home from work, and had started digging a hole to barbeque the cabrito. They sat outside and talked. Phillip (her daughter's fiance) and Rawlings went to get a six-pack of beer, returning about 7:30 or 8:00 p.m. At twelve midnight, she, Monica (her daughter), Phillip and Rawlings went to Jorge's to close the restaurant. They were there 30 to 40 minutes, and arrived at her residence about 1:00 a.m. on Sunday morning. She testified that they all stayed outside again and that "at that time it must have been 1:15 or 1:30 a.m." At that time, Phillip and Monica wanted to leave, but she and Rawlings persuaded them to stay the night. Later, she went in the apartment to prepare the downstairs couch where Phillip and Monica were to stay. The air conditioner had not been working for a month (attempted repairs were unsuccessful), so Rawlings wanted her and him to sleep outside, with Rawlings to sleep in the hammock.

Ms. Hernandez told Rawlings that she was going inside to take a shower. He asked her to get pillows and blankets. She testified that she and Rawlings had slept outside before, using a cot and the hammock. She took a shower, but did not go back downstairs to the backyard; she laid down in bed and fell asleep. So far as she knew, Rawlings was still outside in the hammock when she went inside. The next thing she knew, Monica called for her, telling her that some officers were downstairs. Officer De La Fuente asked if Michael Rawlings was there. She showed him where Rawlings was in the hammock, and told him that he was a guest of hers. She was told by the officer that there had been an assault in the neighborhood. After the officer left, she awakened Rawlings, he came inside, and she told him about the assault. She testified that Rawlings smoked cigarettes and had a tattoo on his left hand, which she described as a "triangle-block."

On cross-examination by defense counsel, she testified that the whole purpose of the other people being at her apartment was to barbeque a cabrito. This was done by putting the cabrito in a hole in the ground, building a fire on top of it, and continuing the fire all night to cook the cabrito. Rawlings built the fire and kept it going. She said that he would get smoke in his hair from the barbeque and that the smoke stays in one's hair. The fire was started at 6:00 to 6:30 and was kept going until the following day. She testified that Rawlings did this *until after 2:00 a.m.,* when she went upstairs; that it was *after 2:00 a.m.* when she did so. (She testified at least twice that it was *after* 2:00 a.m. when she left Rawlings and went upstairs.) She told Rawlings that she was going to come back to the yard, and that she would bring pillows, etc.

When she left Rawlings, he was in the hammock with the barbeque fire next to him. Rawlings did not have a shirt on; there were no bite marks or bruises on his left arm—had there been, she said that she would have noticed them the next day as Rawlings showered. She testified "there

were no bites on him. I've been *asked this before* and there was none." She was shown the last two photos of Rawlings' hand which were taken during trial. She described the tattoos: "Like I said earlier—to me it looks like a triangle or a box, and it's *blue*." She, on two occasions, noticed a strange man hanging around the area of her and W.R.'s apartment. She did not recognize the person, and thought he acted suspiciously. She called this to Rawlings' attention about 9:00 p.m. Saturday.

On redirect examination, the State developed that the stranger was closer to W.R.'s apartment than hers; and that he was a white man. She said that she did not report the suspicious activities to the police and said that the man went toward "the other apartment" when he left. She testified that she spoke to a District Attorney investigator about this; she thinks to one Obenhaus. Ms. Hernandez admitted that it was possible for Rawlings to see her bedroom light go off—that he possibly could have known that she went to bed.

On re-cross, she testified that the area where Rawlings was sleeping was "well lit," and that Rawlings has three big tattoos—one on his chest, and also one with "MIKE" written on his right hand.

The State then called the investigator Obenhaus who testified that she had a conversation with Ms. Hernandez five times and that during these conversations, the matter of the suspicious individual in the area of the apartments *never came up.*

None of the other people who were at the Hernandez apartment was called to refute Ms. Hernandez' testimony as to where Rawlings slept, her preparation of the couch for her daughter and her fiancee, or the *time that she left Rawlings* to go upstairs. Even though she interviewed Ms. Hernandez five times, investigator Obenhaus did not dispute her testimony that Rawlings was in the hammock after 2:00 a.m. when she went upstairs.

Ms. Hulen, a forensic serologist, was called by the State. She examined the telephone cord, bedding, and the blood specimen from Rawlings and seminal fluid from W.R.'s nightgown. W.R. has type O blood, and is a secretor. She testified that 75% of the population are secretors, 25% are non-secretors. An analysis of Rawlings' blood showed that he was type O and a non-secretor. There was no blood or semen on the bedding. There was a trace of blood on the telephone cord, but she could not tell whether it was human. She admitted on cross-examination that she was not attempting to make a specific identification with the test; only that the seminal fluid on W.R.'s gown showed that the semen came from a non-secretor. She testified, however, that her report contained the following statement:

> The nightgown—the seminal stain on the nightgown was non-responsive to testing. Therefore, the semen is *believed* to have been contributed by a non-secretor.

She then admitted that she was not saying "that it's [the seminal stain] *positively* from a non-secretor," that she was saying that she "believed" it to be such, that there was some doubt whether the stain came from a non-secretor. Even if it did, this only limits identification to 25% of the population, and the test did not *identify or link Rawlings, personally, to the seminal sample.*

Jesus Antonio Rojas, a criminal identification employee of the Department of Public Safety, examined hair collected from W.R.'s clothing, known strands of head and pubic hair from Rawlings, and known head hair from W.R. The result:

1. Several hairs from W.R.'s clothing had characteristics similar to that of W.R.

2. Two hairs *that were different from known hair of both the victim and Rawlings were recovered from the bedsheets.*

He found absolutely nothing, he said, to identify or link Rawlings to the victim or the scene of the crime.

Scott Manley testified that he was W.R.'s roommate on September 22 and 23, that he was out of town until Sunday night. Within a day before the Friday preceding the

assault, he noticed that someone had been in the apartment, and items were taken. The matter was reported to the police.

Upon the District Attorney's statement that she was going to recall W.R., defendant objected and renewed his motion to suppress, which was overruled.

W.R. identified the photos of Rawlings' hand as "the hand of the man who attacked me." Again, as during the motion to suppress, she was shown defendant's hand over the objection of defense counsel and the renewal of his motion to suppress, both of which were overruled. She testified:

Q: W., please look at the hand. Try to take a good look at it.

A: That's it.

At this point, defense counsel asked permission of the court to let the record show the description of the hand found at p. 566, *supra*, of this opinion.

On cross-examination, she was shown a copy of her handwritten statement, which she identified and testified:

Q: Does it have the diagram that you referred to—

A: Yes.

Q: —with the letters EZ on it

A: Yes.

From the time that she was shown the photos until the trial began, she had not seen Rawlings. She admitted that she did not know the color of the assailant's eyes (*Cf.* Officer Sprott's statement that she said they were blue). She said that she did not state that the assailant's hair was shoulder or collar length, or "anything like that." Then ensued the following:

Q: When you first wrote this down, as in some of the other testimony and reports, it said *blonde* hair. See that?

A: Uh-huh.

Q: And her—and it doesn't look to me to be the same handwriting. Somebody wrote in *dirty* and inserted *wavy*. Did you do that? That's not your handwriting.

A: No.

On re-direct, the prosecutor showed her the typed statement, which is not to be found in the record. She, through leading questions, stated that she "concludes that she must have written in dirty and wavy." She said that the defendant's hair "does not look like the night he assaulted me." A copy of the pertinent portion of her handwritten statement is inserted:

## LAW AND DECISION

In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the use of photographs to identify a suspect was dealt with. In *Simmons*, the facts were totally dissimilar from those in the instant case. In *Simmons*, the Court held that the photographic identification procedures, under the factual surroundings of the case, were not such as to deny Simmons due process of law, stating:

[T]here was in the circumstances of this case little chance that the procedure utilized led to misidentification of Simmons. The robbery took place in the afternoon in a well-lighted bank. The robbers wore no masks. Five bank employees had been able to see the robber later identified as Simmons for periods ranging up to five minutes. Those witnesses were shown the photographs only a day later, while their memories were still fresh. At least six photographs were displayed to each witness. Apparently, these consisted primarily of group photographs, with Simmons and Andrews each appearing several times in the series. Each witness was alone when he or she saw the photographs. There is no evidence to indicate that the witnesses were told any-

thing about the progress of the investigation, or that the FBI agents in any other way suggested which persons in the pictures were under suspicion.

*Id.* at 385, 88 S.Ct. at 972. The Court, while affirming the conviction, also recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals:

It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. *This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures or several persons among which the photograph of a single such individual recurs, or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup* or courtroom identification.

*Id.* at 383–84, 88 S.Ct. at 970–71 (emphasis added) (footnotes omitted). The Court then held that it was unwilling to prohibit the use of photographic identification, stating:

*Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photo-graphic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.* This standard accords with our resolution of a similar issue in *Stovall v. Denno*, 388 U.S. 293, 301–302, 18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967 [1972–1973], and with decisions of other courts on the question of identification by photograph.

Id. at 384, 88 S.Ct. at 971.

In *Biggers v. Tennessee*, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968), the Court applied the "totality of circumstances" test, holding:

*Stovall v. Denno*, 388 U.S. 293, 18 L.Ed.2d 1199, 87 S.Ct. 1967, and *Simmons v. United States*, 390 U.S. 377, 19 L.Ed.2d 1247, 88 S.Ct. 967, make it clear, however, that independent of any right to counsel claim, a procedure of identification may be "so unnecessarily suggestive and conducive to irreparable mistaken identification" that due process of law is denied when evidence of the identification is used at trial. *Stovall v. Denno, supra,* [388 U.S.] at 302 [87 S.Ct. at 1972], 18 L.Ed.2d at 1206.

*Id.* at 406, 88 S.Ct. at 980. Another danger of the use of suggestive procedures in lineups, which we think is particularly applicable to the instant case, was noted by the Supreme Court in *United States v. Wade*, 388 U.S. 218, 229, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967):

It is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.

Applying the above standards the court held in *Coleman v. State*, 505 S.W.2d 878 (Tex.Cr.App.1974), that the photographic display (where two photographs of the appellant were shown to the complaining witness, who admitted that her in-court identification was based on the pictures, with

knowledge on her part that the man in the pictures was already in custody) was impermissibly suggestive and "was so defective as to indicate or suggest the photograph which the witness was to identify"; the court applied the "second half" of the *Simmons* test, and held that there was a "substantial likelihood of irreparable misidentification"; and reversed the judgment of conviction and remanded the case.

In *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and *Jackson v. State*, 657 S.W.2d 123, 130 (Tex.Cr.App. 1983) the standards to be employed in passing upon the admissibility of out-of-court identification and "the corrupting effect of a suggestive identification procedure in assessing reliability" are set out. The factors are:

1. *Opportunity to view.* Here, W.R.'s testimony is clear that she could not identify appellant except by the tattoo. Her description of the tattoo, as noted, remained constant throughout the motion to suppress and the trial on the merits. It differed, completely, from the tattoo on appellant's hand as shown in the photographs. At one point appellant testified that during the struggle with appellant she kept her eyes *closed because she did not want to identify him.* One would think that appellant's very distinctive "Afro" type hair style would have been of help to W.R. She never identified him from such standpoint. Moreover, her description of the assailant's hair failed to match its appearance in the "mug" photo.

2. *Degree of attention.* Except for the tattoo, appellant's attention to any other descriptive characteristics of the assailant is meager, at best.

3. *Accuracy of description.* The inconsistencies between W.R.'s description of the tattoo and its actual appearance have been noted. Nothing further need be added. *Cf.* the two certifications by the trial court of the true description of the tattoo with her descriptions of the tattoo on the assailant.

4. *Level of certainty.* Never, until she was told by the police that the assailant was her neighbor, did W.R. attempt to identify him, though she had seen him twice within the month preceding the assault. It was only by means of the impermissible suggestions by the police that she could identify the photographs of the tattoo. Once she had done so, as suggested by the Supreme Court, she was not likely to change her testimony.

5. *Passage of time.* At *no time before the trial* on May 20, 1985, was W.R. shown a clear photograph of the tattoo on appellant's hand. Nor did she ever see his hand prior to trial. Why did not Officer James hold a line-up as requested? At the very least, we think W.R. should have had an opportunity to actually see the hand before making an identification from totally inadequate photographs based upon impermissible suggestion made by James and other officers. Her identification was cast in stone, we think, when he told her that the person whose hand the pictures were of, had been *previously charged with rape.*

*Cf. United States ex. rel. Thomas v. New Jersey*, 472 F.2d 735, 739 (3rd Cir.1973), *cert. denied*, 414 U.S. 878, 94 S.Ct. 121, 38 L.Ed.2d 123 (1973); *United States v. Johnson*, 461 F.2d 1165, 1169 (5th Cir. 1972); *Kimbrough v. Cox*, 444 F.2d 8, 11 (4th Cir.1971); *United States v. Gambrill*, 449 F.2d 1148, 1152 (D.C.Cir.1971); *Roper v. Beto*, 318 F.Supp. 662, 664–65 (E.D.Tex. 1970), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2053, 32 L.Ed.2d 336 (1972).

Texas has approved the standards in *Simmons v. U.S., supra,* in numerous decisions. In *Coleman v. State, supra,* in which the photographic identification procedures were strikingly similar to those employed in the instant case, the court said:

In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, the Court stated:

"... convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. This standard accords with our resolution of a similar issue in *Stovall v. Denno*, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972–1973, 18 L.Ed.2d 1199, and with decisions of other courts on the question of identification by photograph."

505 S.W.2d at 880.

■■■ We hold that (1) the tattoo photographic identification (which the State concedes is the sole basis of identification) was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification and that such impermissibly suggestive procedures tainted W.R.'s in-court identification of the tattoo; and (2) that the evidence is clear and convincing that the in-court identification was not of independent origin. We have reviewed *Herrera v. State*, 682 S.W.2d 313 (Tex.Cr.App.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2665, 86 L.Ed.2d 282 (1985); *Jackson v. State*, *supra*; and *Jackson v. State*, 628 S.W.2d 446 (Tex.Cr.App.1982), all cited by the State. To the extent that the State relies upon such authorities, we find they are distinguishable from the instant cause and, therefore, not dispositive. The judgment of conviction must be reversed.

■■ By his third ground of error, appellant claims that the trial court erred in allowing the evidence concerning the out-of-court photographic identification, because the defendant was in custody and the display was conducted in the absence of counsel and in violation of the defendant's rights under the Sixth and Fourteenth amendments to the United States Constitution. Appellant's point is disposed of contrary to his position by *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), which held that there was no right to counsel at a preindictment identification by photographs. We overrule appellant's third ground of error.

The judgment of the trial court is reversed and this cause is remanded for new trial.

GAMMAGE, J., not participating.

578

STATE'S EXHIBIT NO. 1

STATE'S EXHIBIT NO. 2

STATE'S EXHIBIT NO. 3

STATE'S EXHIBIT NO. 4

STATE'S EXHIBIT NO. 7