Ralf P. LOSERTH, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–94–00268–CR.

Court of Appeals of Texas,
San Antonio.

Dec. 23, 1998.

Discretionary Review Refused
May 12, 1999.

---

Mark Stevens, Jeffrey J. Pokorak, San Antonio, for Appellant.

Daniel Thornberry, Assistant Criminal District Attorney, San Antonio, for Appellee.

Before PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice and SARAH B. DUNCAN, Justice.

## OPINION

PHIL HARDBERGER, Chief Justice.

This murder case, involving an in-court identification, was decided by this court in 1996. We reversed the trial court, after conducting a *de novo* review, finding that the in-court identification of appellant was wrongly admitted because it was tainted by the impermissibly suggestive pretrial photographic identification in violation of appellant's due process rights. *Loserth v. State*, 931 S.W.2d 322 (Tex.App.—San Antonio 1996), *vacated*, 963 S.W.2d 770 (Tex.Crim. App.1998).

After that opinion was issued, the Court of Criminal Appeals set forth the standard for courts of appeals' review of trial courts' rulings on motions to suppress evidence based upon Fourth Amendment claims. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). *Guzman* holds that the appellate courts, including the Court of Criminal Appeals, "should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Id. Guzman* instructs that we "should afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Id.* We may review *de novo* "mixed questions of law and fact" not turning on an evaluation of credibility and demeanor. *Id.* The Court of Criminal Appeals may exercise its discretion to review *de novo* these decisions by the intermediate appellate courts. *Id.*

In harmony with *Guzman*, the Court of Criminal Appeals held this year that the standard in *Guzman* is also applicable to review of a trial court's ruling on a motion to suppress evidence based upon a claim that an in-court identification should not have been admitted due to taint by an impermissibly suggestive pretrial identification procedure. *Loserth v. State*, 963 S.W.2d 770, 771 (Tex. Crim.App.1998). The Court remanded *Loserth* to this court so that we could apply the standard of review enunciated in *Guzman*. We do so in this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

A young, popular 24–year–old woman named Brenda Epperson was murdered by an intruder in her apartment on May 17, 1992. She was stabbed 12 times. The motive was, and is, difficult to understand. She was neither sexually molested, nor robbed. She was well-liked and successful in her work as an insurance adjuster. Her friends were many; her enemies, if any, were unknown. Because she screamed, the time of her death can be fairly closely determined to be around 3:40 a.m. on a Sunday morning. She had been out with girlfriends that night, and had neither been drinking nor using drugs. Only a few minutes before, she had been brought home by her girlfriends, who watched her until she was safely in her locked, lighted apartment.

The witness who heard the scream and called the police shortly thereafter was Lewis Devlin, a neighbor who lived in the adjacent apartment building on the second floor. His apartment faced the third-floor apartment of Epperson. It was later determined that it was 87 feet, 10 inches between the apartments. Not being certain as to what he should do about the scream, and seeing nothing, he did nothing. But shortly thereafter, he heard a crashing noise, and he looked across to Epperson's apartment again. The apartment was lit, as was her balcony, which faced him one story above his. This time he saw a tall, thin man come out of the apartment onto the balcony, look around and step over the railing on the outside edge of the balcony. The next thing he saw was a large object shoot toward the ground. Devlin looked back at the balcony, unable to believe that anyone would have voluntarily jumped the 26 feet from the balcony to the ground, but saw the balcony was now empty. Con-

cluding correctly that the object he had seen falling was indeed the man he had seen on the balcony, Devlin called the Universal City police at 3:51 a.m. They arrived within one minute, while he was still talking to the dispatcher, and ran up the stairs to Epperson's front door (the only door except the sliding entrance onto the third floor balcony). There were no signs of a forced entry. After beating on the door, they kicked it off the frame.

Epperson's lifeless body was jammed up against the door, but the police were able to push the door open. There was much blood—on the door, on the floor, on the walls, on the rug, on the vertical venetian blinds that covered the sliding door that went onto the balcony, and on the railing of the balcony. The sliding door was off its rail, bent outwards; the screen behind the sliding door totally knocked off. The police then went downstairs, expecting no doubt that a person having jumped three stories might still be there, or at least somewhere nearby in an injured condition. The only thing they found, however, was an indentation in the gravel surrounding the building. There was a tree and a shrub in the vicinity but no evidence that the killer had fallen into those, or that they had broken his fall. Whatever injuries might have been expected in someone falling such a great distance, it is undisputed that the killer was still mobile enough to leave the scene. No suspects were arrested that night, or for many weeks to come despite the best efforts of the Universal City police, the Texas Rangers and the science laboratories of the Department of Public Safety.

In the latter part of September though, the defendant, Ralf Loserth, was indicted by a San Antonio grand jury. Loserth, who was an Army reserve lieutenant on duty in Indiana, drove back to San Antonio and turned himself in. Eventually, he stood trial, testified in his own behalf that he was not guilty, but was found guilty of murder. The jury imposed a lenient sentence of 25 years, considering the extreme savagery to such an innocent victim with no mitigating circumstances.

## II. Factual Insufficiency

In his first point of error on remand, Loserth urges that the evidence is factually insufficient to support his conviction. This court found in its first opinion that there was sufficient factual evidence to support the conviction. The State did not complain of this court's finding of factual sufficiency, and it was not addressed by the Court of Criminal Appeals. We review a challenge to the factual sufficiency of the evidence by considering all the evidence "without the prism of the light most favorable to the prosecution and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App.1996). On remand, we have again considered the factual sufficiency point, and we again overrule Loserth's first point of error. We include in this opinion our review of the facts found in the first opinion, though, because it is useful in weighing the now more critical issue of the in-court identification.

The principal eyewitness, Devlin, was unable to give much of a description to the police. Both the night of the murder, as well as four days later when he gave a written statement to the police, Devlin could not do better than to say the person was (1) tall, (2) thin, and (3) wearing dark clothes like a jumpsuit. From then on, including several conversations with police officers and even after being hypnotized by a Texas Ranger, Devlin could not, or would not, elaborate further on this description. On July 27, two-and-one-half months after the murder, Devlin was again called in by the Universal City police. Critical to our determination, he was only shown a single color photograph of one suspect—Loserth. The police explained that they did not show Devlin a traditional line-up because they were just trying to find out whether the defendant had been seen around the apartment complex. Whatever the reason for the procedure, Devlin's memory improved dramatically. At that moment, Devlin positively identified the defendant as the man on the balcony the night of the murder. He never again wavered, and identified Loserth as the man on the balcony (the man on

the balcony most certainly being the murderer) during his testimony at trial. Devlin's explanation of the late identification was that he had been afraid, and that he felt the defendant had seen him and might come after him. Supporting his contention that he was afraid is the fact that he had moved out of his apartment the day after the murder, though it is less clear why seeing the photograph would make him less afraid. In any case, the jury heard this testimony of an eyewitness making a positive identification of the killer. Cross-examination did not reveal any doubts by Devlin about the identity of the man on the balcony. He was certain.

The jury obviously believed Devlin because there was absolutely no other evidence to place Loserth at the scene of the crime. Loserth, a former acquaintance, or boyfriend of the victim, depending on the viewpoint, was extraordinarily cooperative with the police. He gave statements without an attorney, and he allowed the police to search his apartment, his garage and his car without warrants. He twice gave hair samples from his head, armpit and pubic areas. Loserth voluntarily gave blood samples, saliva samples, fingerprints, and palm prints. He allowed the police to take clothes from his closet to have fabric samples tested, and knives from his kitchen and bedroom to see if they would correlate with the wounds on the victim. When indicted, he drove more than a thousand miles back to San Antonio to turn himself in the next day, and, at trial, he waived his Fifth Amendment rights and took the stand in his own behalf. None of the physical items taken by the police, or tested by them, ever linked Loserth to the crime.

There was one other eyewitness, Eileen McGraff, who gave corroborating evidence that Loserth was in the vicinity at the approximate time of the murder. McGraff, a district manager for the local San Antonio newspaper, was on her way to work the morning in question. Between 4:15 a.m. and 4:30 a.m., while driving 25 miles per hour, McGraff approached a pedestrian who was walking in the same direction as she was driving. This attracted her attention as it was unusual for anyone to be out walking at that time of the morning. As McGraff passed this man, she looked at him and he at her. She continued driving, and looked in her rearview mirror, but the man was gone. At the trial McGraff identified the man she passed that night as Loserth. The man she saw was walking south, about one mile from the murder scene and about one-and-a-half miles from Loserth's apartment. Both Loserth's apartment and the murder scene were back to the north, so the man she saw was walking in the opposite direction of both Epperson's and Loserth's apartments. The man was not limping.

Lemuel Johnson, who also lived in Epperson's apartment complex, testified that he saw a man in the complex around the time of the murder. Johnson testified that he saw a "pretty tall" white man running through the apartment parking area dressed in a dark blue or black warm-up suit with a hood. Johnson estimated the man's height between 6' and 6'5" and his weight between 180 to 200 pounds. The first time Johnson saw the man was at 3:15 a.m., as the man was walking in the direction of the victim's apartment. Sometime later, Johnson saw the person coming away from the apartment building, but this time the person was limping. Other than the above description, Johnson could not give any greater detail.

Loserth's whereabouts from around 5:00 a.m. the morning of the murder are not in dispute. He was doing reserve duty in his capacity as a lieutenant at Fort Sam Houston. Loserth testified he arrived at Fort Sam Houston at 4:50 a.m., and his testimony was confirmed by one of his superiors, Major Haas. Loserth was cleanly dressed in the appropriate fatigue uniform when he reported for duty. His first job was to scale an eight-foot chain link fence, with barbed wire on top, to turn on the field lights. Loserth did this without difficulty, and climbed back down the same way. A little later, he repeated this process in order to turn off the lights. Other reserve officers had arrived by 5:15 a.m., and they confirmed that Loserth was already present and working.

Loserth remained at Fort Sam Houston throughout the day, voluntarily staying to eat a barbeque lunch and play volleyball in the afternoon. Of the several people present

that day who testified at trial, no one noticed any limping, restriction of movement, or scratches or cuts on Loserth. The witnesses testified that Loserth did not act out of the ordinary, either in his speech or actions. The next day, Monday, Loserth was back at work at his regular job at I.Q. Software, a computer software business. None of his coworkers noticed anything different about Loserth, either in his physical, social or mental behavior.

Loserth attended the victim's funeral on Wednesday. One of Epperson's co-workers, Carol Gardner, said she saw Loserth limping and rubbing the top of his leg at the funeral, but she was the sole witness to so testify. Numerous witnesses, including the police themselves who talked to Loserth the day after the murder, said he was not limping or injured in any way that could be observed. The police also asked Loserth to pull up his pants-leg to determine if he was scratched or bruised. He did so, but they saw nothing.

Loserth, 26, is a graduate of St. Mary's University where he received a commission as a second lieutenant. He has no criminal record, outside this case. Loserth was working at the time of the murder, and up until the trial, in his field of computers. He was doing reserve duty on the weekend of this murder. Loserth had just completed a series of physical tests at Fort Sam Houston the day before the murder. He was in good, but not outstanding, shape. He scored 212 out of a possible 300 points on the tests; enough to pass, but not excel. Loserth is 6'2" tall, and weighs approximately 190 pounds. He had been engaged since December of 1991 to a University of Texas student and was still engaged to her at the time of Epperson's death.

Loserth met Epperson in the fall of 1991 in the building where they both worked. They also lived close together, about six-tenths of a mile apart, with Loserth's apartment just up the road to the north from Epperson. It was 15 to 17 miles from Loserth's apartment to Fort Sam Houston, and Loserth testified the drive took about 20 minutes. Other witnesses said the drive could take as little as 15 minutes.

With the given time of the scream at 3:40 a.m., and Loserth arriving at work dressed appropriately at 4:50 a.m., there was conflicting testimony as to whether it was physically possible for Loserth in that one hour and ten minutes to get from the murder scene to somewhere he could clean up (the murderer would most likely have been covered with blood, because there was a great deal of blood at the murder scene), change clothes and drive to work. The issue of timing is further complicated by McGraff's testimony that she saw a man walking one mile from the scene between 4:15 a.m. and 4:30 a.m. But juries have the duty to sort out conflicting facts. They did so on this occasion; and there is evidence to support that implied finding.

There was also conflicting testimony as to whether it was possible for Loserth to have jumped three stories and have been able to go anywhere very fast, much less to participate in strenuous physical activities without signs of being hurt. Here too, though, the jury can weigh the facts, and there was some evidence to support them, especially with the eyewitness identification made by Devlin.

The implied motive was that Loserth was a jilted and angry lover, but the testimony on this point is weak. There was no evidence of anger, arguments, or violent incidents between Loserth and Epperson, or that Epperson was afraid of Loserth. There is some evidence that, in the fall of 1991, a romance was desired by Loserth. He wrote her two poems, the gist of which was that he wanted to spend more time with her. They could hardly be classified as passionate, though, and Loserth testified that they never had sexual intercourse at any time. How much time they spent together is unclear by the evidence. The testimony ranged from two dates, according to Loserth, to many times, stretching from October 1991 until Epperson's death, according to some of Epperson's friends.

Loserth did not always help himself. None of these things mentioned below proved he committed a murder, or any crime, but they did not endear him to the jury:

(1) When first questioned by the police as to where he was that night of the murder,

Loserth said he was spending the night with his fiancée. This was a lie. A few days later, Loserth voluntarily admitted that he had made that up, saying that he was alone that night and simply went to bed in his apartment.

(2) Loserth understated his relationship with Epperson. He told the police he had only had a couple of dates with her, and those were back in the fall of 1991. He explained that he had gotten engaged in December of 1991, and had no further relationship with Epperson except for occasionally running into her at work, as they both worked in the same building. Several witnesses testified Loserth continued to come by and see Epperson at her work station, and that they talked on the phone well into the spring of 1992. It is not clear just how long into 1992 these contacts continued, or whether these contacts had stopped in the weeks before her murder. It is also not clear how the relationship was terminated, or whose idea it was to terminate it, if indeed it was terminated. It is also unknown if it was a romantic relationship. Suffice it to say, it was something more than Loserth led the police to believe.

(3) Loserth was cooperative with the police, but, of course, they did not always tell him everything they did. One of the unannounced things the police did was search his garbage. The police never found anything of any importance. On one occasion though, they found a note. This note, written by Loserth, informed them that if they kept searching through his garbage they might find Jimmy Hoffa. The police were not amused, and, it is fairly probable, neither was the jury.

(4) Loserth was asked for second hair samples while he was on temporary reserve duty in Indiana. He agreed, and a Dr. Duncan was given the job of getting the hair samples. While Duncan was doing so, and not knowing the history of the case, Duncan asked Loserth what this was all about. Loserth replied that some girl in San Antonio had gotten "hacked up." Duncan was chilled by the insensitivity of the remark, and the jury, knowing more than Duncan about the relationship, was probably more so.

In its original brief, the State refers to the above actions and words as describing a man "disingenuous, chameleon like and extraordinarily narcissistic." There may be evidence to support such a view, but, of course, it does not mean he committed murder.

The jury was within its rights to consider all of the evidence, including the above actions and words. In addition, they had the two eyewitnesses' in-court identification of the defendant. Devlin's testimony was especially critical as it put the defendant directly at the scene of the murder. McGraff's testimony, while important, was essentially corroborative. It put the defendant in the general vicinity around the time of the crime. In light of this evidence, we cannot say that it is factually insufficient to support the conviction. Appellant's first point of error is overruled.

### III. ADMISSIBILITY OF THE IN-COURT IDENTIFICATION

#### A. Standard of Review

In his third point of error, Loserth alleges that the trial court erred in overruling his motion to suppress Devlin's in-court identification testimony. In our prior opinion, we sustained this point of error and remanded the case for a new trial. The Court of Criminal Appeals, in vacating and remanding the case back to this court on the in-court identification issue, gave us the following guidelines:

(1) Give almost total deference to the trial court's determination of historical facts when they are based on an evaluation of credibility and demeanor. *Loserth,* 963 S.W.2d at 772.

(2) Give almost total deference to the trial court's ruling on application of law to fact questions if they turn on credibility and demeanor. *Id.*

(3) Review *de novo* mixed questions of fact and law that do not fall into the above category. *Id.*

(4) The mixed questions of law and fact presented in the instant case do not turn on an evaluation of credibility and demeanor and may be reviewed *de novo. Id.* at 773.

(5) The five factors enunciated in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) are all issues of historical fact and should be considered deferentially in a light favorable to the trial court's ruling. *Loserth*, 963 S.W.2d at 773.

(6) We need not assign the same weight or significance to the historical facts as the trial court in deciding the ultimate question of reliability. *Id.* at 774.

(7) The *Biggers* factors, viewed in the light most favorable to the trial court's ruling, must be weighed *de novo* against the corrupting effect of the suggestive pretrial procedure. *Id.* at 773–74.

### B. Burden of Proof

■ Determining the admissibility of an in-court identification that is challenged by a defendant requires a two-step analysis. First, we consider whether the pretrial identification procedure was impermissibly suggestive. *Barley v. State*, 906 S.W.2d 27, 33 (Tex.Crim.App.1995); *Delk v. State*, 855 S.W.2d 700, 706 (Tex.Crim.App.1993); *Cantu v. State*, 738 S.W.2d 249, 251 (Tex.Crim.App. 1987). Second, if the procedure was impermissibly suggestive, we determine whether the procedure gives rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 390 U.S. 377, 19 L.Ed.2d 1247 (1968); *Barley*, 906 S.W.2d at 33; *Delk*, 855 S.W.2d at 706; *Cantu*, 738 S.W.2d at 251. It is this second element that directly implicates a defendant's due process rights. *Simmons*, 390 U.S. at 384; *Johnson v. State*, 901 S.W.2d 525, 534 (Tex.App.—El Paso 1995, pet. ref'd).

■ The defendant bears the burden to prove these two elements by clear and convincing evidence. *Barley*, 906 S.W.2d at 34; *Delk*, 855 S.W.2d at 706; *Herrera v. State*, 682 S.W.2d 313, 318 (Tex.Crim.App.1984). If the defendant is able to do so, the in-court identification is inadmissible unless the State can demonstrate by clear and convincing evidence that the identification was of "independent origin." *United States v. Wade*, 388 U.S. 218, 240 & n. 31, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Williams v. State*, 477 S.W.2d 885, 889 (Tex.Crim.App.1972); *Johnson*, 901 S.W.2d at 534.

■ Reliability is the "lynchpin" question in determining admissibility of identification testimony. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Loserth*, 963 S.W.2d at 772; *Barley*, 906 S.W.2d at 34. Testimony is reliable if the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure. *Simmons*, 390 U.S. at 383, 88 S.Ct. 967; *Loserth*, 963 S.W.2d at 772; *Jackson v. State*, 657 S.W.2d 123, 128 (Tex.Crim.App.1983).

In *Neil v. Biggers*, the Supreme Court enunciated five factors which we use to assess reliability. 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The factors are:

(1) The opportunity of the witness to view the criminal at the time of the crime;

(2) The witness's degree of attention;

(3) The accuracy of the witness's prior description of the criminal;

(4) The level of certainty demonstrated by the witness at the confrontation, and

(5) The length of time between the crime and the confrontation.

*Id.* These are nonexclusive factors, and Loserth urges us to consider the fact of Devlin's hypnotism as an additional factor that weighs against a reliable identification. In light of the particular facts of this case, we find the hypnotism testimony to be of some relevance, and discuss it accordingly in the context of our *de novo* balancing.

### C. Impermissibly Suggestive Procedure

■ Under the first step in our analysis, Loserth must prove that the single photographic display was impermissibly suggestive. We conclude that Loserth satisfied his burden as to this first element. The use of a lone photograph, without any of the traditional safeguards of a lineup or a photographic array, is inherently suspect and has been uniformly condemned by courts. *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *see also Delk*, 855 S.W.2d at 706; *Madden v. State*, 799 S.W.2d 683, 694–95 (Tex.Crim.App.1990).

*Simmons* aptly identifies the vice of such a procedure:

> Th[e] danger [that a witness will make an incorrect identification] will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw. Regardless of how the initial misidentification comes about, **the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen,** reducing the trustworthiness of subsequent lineup or courtroom identification.

*Simmons,* 390 U.S. at 383, 88 S.Ct. 967 (emphasis added).

### D. Very Substantial Likelihood of Irreparable Misidentification

■ Having determined that displaying a single photograph was an impermissibly suggestive procedure, we now consider whether Loserth established that the procedure gave rise to a very substantial likelihood of irreparable misidentification. *See Simmons,* 390 U.S. at 384, 88 S.Ct. 967. In conducting this portion of the analysis, we first consider the facts of this case in relation to the five *Biggers* factors. We take into account that each of the *Biggers* factors is an issue of historical fact that we view deferentially, in a light most favorable to the trial court's ruling. *Loserth,* 963 S.W.2d at 773. We also note, however, that we are only required to defer to the trial court's determination of historical facts that the record supports. *Loserth,* 963 S.W.2d at 772.

#### 1. *Biggers* Factors

##### a. *Opportunity of Devlin to View the Criminal*

This element of *Biggers* was the only express finding made by the trial court. The trial court held that Devlin "had an adequate opportunity to view the Defendant at the time of the offense." · The trial court's finding is supported by Devlin's testimony that the area was well-lit and the evening was moonlit. Devlin also testified that he could see the man's face. Since the record provides some support for the trial court's finding, we follow the dictates of *Loserth* and defer to that finding.[1]

##### b. *Devlin's Degree of Attention*

Since the trial court did not make an express finding of historical facts on this or any other *Biggers* factor, we must view the facts in a light favorable to the trial court's ruling. While Devlin had been studying that evening and was not a victim of the crime itself,[2] he testified that he was awake and alert. Devlin was an air force patrolman whose normal shift was 5:00 p.m. to 6:00 a.m.; therefore, he was accustomed to being awake and alert in the early morning hours.[3] Furthermore, Devlin had heard a loud scream in the middle of the night, and it fully accords with human nature that a person hearing a loud scream when most people are long-since sleeping is going to look to see what is going on. Devlin so testified. He was specifically looking to see what was happening.

##### c. *Accuracy of Devlin's Prior Description of the Criminal*

Epperson was murdered on May 17, 1992. On May 21, Devlin gave a written statement to the police. He gave the following description: (a) "a tall, thin person, wearing dark clothes;" and, later in the statement, (b) "I did not get a description of this person. All I know is this person was tall, thin build, and

---

**1.** Loserth argues that the facts also support a contrary finding, including the fact that Devlin was standing almost ninety feet away and he only saw the man for five to ten seconds while the man was moving. We acknowledge that the record contains facts that are contrary to the trial court's finding; however, since the record does provide some support for the trial court's ruling, we are required to defer to it.

**2.** Witnesses who are victims, rather than casual observers, are generally believed to have a great-

er degree of attention. *See Manson,* 432 U.S. at 115, 97 S.Ct. 2243; *Barley,* 906 S.W.2d at 35.

**3.** A witness's status as a police officer or trained observer lends additional weight to their attention to detail. *See Herrera v. State,* 682 S.W.2d 313, 319 (Tex.Crim.App.1984) (noting witness had special training in the army); *Spencer v. State,* 466 S.W.2d 749, 753 (Tex.Crim.App.1971) (noting witness was a narcotics agent).

wearing dark clothes like a jumpsuit." This statement was sworn to before the investigating officer and a notary public.

The investigating officer, Lieutenant Dewey, was the officer to whom the above statement was given. The written statement was four days after the murder, but Dewey had talked to Devlin within two hours of the murder at the scene. At that time, Devlin had said he could only identify the person as "tall and thin." Dewey wrote in his report at that time that "[h]e did not get a description of the person." Devlin's statements at the murder scene, and, four days later when a written statement was taken, are totally consistent: the criminal was tall, thin, and wearing dark clothes, and no further description was possible. Dewey, a veteran police officer of 18 years, testified that a good description of the criminal was of foremost importance, and that he tried to get a good description, but that Devlin simply couldn't give more of description than "tall and thin." The first officer on the scene, Aaron Pendley, was the first officer to speak to Devlin. He, too, was given no further description by Devlin.

In June, Devlin agreed to be hypnotized by the police in an effort to improve his ability to describe the criminal. The hypnosis was performed by the Texas Rangers. Devlin was cooperative, but the hypnosis revealed nothing more than was already known except the assailant was identified as a "man" for the first time. The "tall and thin" person, then, was a man.

At trial, Devlin testified that he "thought" that he had told Lieutenant Dewey that the person was white, but he couldn't really recall. Dewey testified that Devlin never told him that the person was "white, black or brown." No police report ever mentions that Devlin had described the criminal as "white."

The foregoing was the only description provided by Devlin before he was shown the photograph. The third *Biggers* factor instructs courts to examine "the accuracy of the witness's *prior* description of the criminal." 409 U.S. at 199, 93 S.Ct. 375 (emphasis added). Devlin's *prior* description of Loserth, although not inaccurate, was so vague and general that it could have applied to thousands of people.

### d. The Level of Certainty Demonstrated by Devlin

There can be no doubt that Devlin, once he was shown the single color photograph of Loserth, was certain of his identification. Devlin indicated he was certain, and from that time forward to his identification of Loserth in court, Devlin never expressed any doubt about the identity of the man on the balcony.

### e. The Time Between the Crime and the Confrontation

Almost two years passed from the date of the crime, May 17, 1992, to the in-court confrontation and identification on March 4, 1994. Approximately two and one-half months elapsed between the date of the crime, May 17, 1992, and the date Devlin was shown the lone color photo on July 27, 1992.

### 2. Weighing the *Biggers* Factors Against the Corrupting Effect of the Pretrial Identification Procedure

Having reviewed the historical facts relating to the *Biggers* factors in a light most favorable to the trial court's ruling, we now weigh the *Biggers* factors against "the corrupting effect" of the suggestive pretrial identification procedure. *Loserth*, 963 S.W.2d at 774. We are not required to assign the same weight or significance to the historical facts as the trial court in deciding the ultimate question of reliability; however, the Court of Criminal Appeals has encouraged us to discuss the weight of each factor in balancing them against "the corrupting effect" of the suggestive pretrial identification procedure. *Loserth*, 963 S.W.2d at 774 & n. 4.

A review of the cases which consider the question of impermissibly suggestive photographs shows that a clear majority have ultimately affirmed the conviction even though the photographs were used as a part of the State's case. The usual rationale for affirming the conviction is that there was a high reliability factor associated with the prior identification, and frequently there was ample other evidence that the defendant com-

mitted the crime. *See, e.g., Delk,* 855 S.W.2d at 707 (holding that witness's detailed description of defendant prior to improper photographic presentation "reduce[d] likelihood that she was reliant on the photograph to identify appellant at trial"); *Lang v. State,* 747 S.W.2d 428, 432 (Tex.App.—Corpus Christi 1988, no pet.) (finding overwhelming evidence that defendant was perpetrator of crime mitigated significance of impermissible pretrial identification procedure). Further, it is often difficult for the defendant to prevail on this issue because the defendant carries the burden on this point of showing that the in-court identification is unreliable by clear and convincing evidence. *Delk,* 855 S.W.2d at 706; *Madden,* 799 S.W.2d at 695.

The "impermissibly suggestive" standards are not always hollow words, though, and some cases have been reversed when there is a substantial doubt raised about the reliability of the identification. In *Dispensa v. Lynaugh,* the Fifth Circuit reversed a Texas defendant's rape conviction, holding that "[t]he out-of-court identification was inadmissible and the in-court identification could not stand without it." 847 F.2d 211, 221 (5th Cir.1988). *Dispensa,* while applying the *Biggers* factors, found that the most important of the factors was the witness's inability to describe the criminal before the impermissibly suggestive act. Regarding the factors, the *Dispensa* court said: "Of these, by far the most significant in this case is the lack of accuracy of the witness's prior description of the criminal." *Id.* at 220. The *Dispensa* court found the victim's earlier inability to say whether her assailant had a moustache, was hirsute, and had a tattoo was fatal to the later identification, either in or out of court. *Id.; see also Proctor v. State,* 465 S.W.2d 759, 765 (Tex.Crim.App.1971) (reversing conviction where "identification procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification as to amount to a denial of due process.")

We believe the *Dispensa* observation applies to this case. The most significant of the *Biggers* factors in this case has to be the "lack of accuracy of the witness's prior description of the criminal." In our case, Devlin could never get beyond "tall and thin" for almost two-and-a-half months. His written statements never even mention whether the criminal was Anglo, Mexican–American, or African–American. In his testimony, he explained that he was never asked, but this is hard to believe and was disputed by the police. Common sense tells us that a hard-working police investigating unit, and there is plenty of evidence that they were hard-working, would have done everything they could have done to have a better description from the one eyewitness who could place the criminal at the murder scene itself.

Devlin also stated that he did not give a better description because he was afraid. Fear is an element that courts can consider. *See Cantu,* 738 S.W.2d at 252 n. 1. For example, in *Cantu,* the Court of Criminal Appeals noted that the victim's prior uncertainty in identifying the defendant was "adequately accounted for by [the victim's] testimony of his fear of appellant and the police officers' testimony that they thought [the victim] recognized appellant but was afraid to say so." *Id.* at 253. Unlike the instant case, in *Cantu* the officers observed the victim's fear when he refused to identify the defendant in previous photographic arrays, and the officers testified that they felt that the victim knew more than he was telling. *Id.* In this case, we do not have this additional indicia of reliability from a third party who physically observed Devlin's fear on prior occasions, and, unlike the facts in *Cantu,* Devlin was an observer, not the victim of a brutal attack who was recovering from several gunshot wounds in his head, neck and chest. *See id.* at 250. The opportunity of the criminal to see and identify the witness is remarkably different in *Cantu* from this case. In *Cantu* the witness had been poked awake by the criminal, a person whom he already knew, in a lighted room. He was then shot by that person at point-blank range in the lighted room. The visual relationship between the witness and the criminal was intimate and close.

By contrast, the witness in this case, Devlin, was 88 feet away in the safety of his own apartment: kneeling on his couch looking at someone he had never seen before. Nor is there any evidence that the criminal had ever

seen Devlin before. In our case, the police even tried hypnotizing Devlin in an effort to probe any suppressed subconscious memory, but this was a failure.

No historical facts occurred between the general vague description and the absolute certain specific identification. The dramatic change from virtually no memory to complete certitude on being shown a single photograph raises very serious questions on the reliability of the identification. It was these very questions that, no doubt, caused a careful trial judge to suppress the out-of-court identification. Yet the trial court allowed Devlin's in-court identification. The logical question that follows has to be whether the in-court identification is more reliable than the out-of-court identification. There are circumstances where it could be. For example, a witness might have already given a fairly accurate description of the criminal, and then been shown a sole photograph and the out-of-court identification suppressed. The in-court identification would still be valid because it would be consistent with what was already known. The danger in a case such as ours is that it is far from clear what the witness could have identified before being shown the sole photograph.

The trial court gave considerable weight to Devlin's opportunity to view the accused; however, under the facts in this case, we do not find that factor to be the most significant factor. We also do not think Devlin's degree of attention was the most important consideration. These two factors are relevant because they are items that support the possibility of identification of the criminal. But they are overshadowed by Devlin's inability to provide a more detailed description until after the suggestive pretrial procedure. Although the trial court "was entitled to and could have reasonably believed" that Devlin could have given a detailed description at any time, *Loserth*, 963 S.W.2d at 774 n. 3, the fact is that he failed to provide that description. He only identified Loserth as the assailant after he was improperly shown a lone photograph.

It is the vice of a corrupting procedure that thereafter a witness may be convinced that he or she is right and would have come to the same decision anyway. *Simmons*, 390 U.S. at 383, 88 S.Ct. 967. This is the very reason for the *Biggers* and *Wade* factors of comparing the accuracy of the prior description of the criminal with the description after the corrupting act has taken place. Before the photograph was shown to Devlin he had only used the words "tall and thin," "man," and, arguably, "white." Here, in his own words, is what happened when Devlin was shown the photograph on July 28:

> The instant I saw the photograph, that scared feeling came back and I felt a chill come over me like electricity and I said, "Oh, yeah. I've seen him before." At that point I realized that the guy in the photograph was the guy I had seen jump from the balcony of the apartment of the woman who was murdered.

Devlin's epiphany was seeing the photograph. Gone is the generic description that would have applied to thousands of people in Bexar County and hundreds of thousands in Texas. The identification was now complete, definitive and certain. Devlin had complete certitude from that moment on as to who was the killer.

By showing Devlin a lone photograph, the police suggested that the man in the photograph was the man they wanted Devlin to identify. Dewey admitted that by the time this lone photograph was shown, Loserth was the only suspect the police were pursuing. Using such a suggestive procedure in view of the meaningless generic description of the assailant previously provided by Devlin was improper. We find that the taint of that procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable harm. Without that procedure, the description may have remained vague, uncertain, and may never have been forthcoming. Weighing the *Biggers* factors *de novo* against "the corrupting effect" of the suggestive pretrial identification, we hold the in-court identification was not admissible.

### E. Independent Origin

Having found that the identification procedure was impermissibly suggestive to the extent that the in-court identification was rendered inadmissible, the State must show

by "clear and convincing evidence" that the in-court identification was of "independent origin" if the in-court identification is to survive. *Wade*, 388 U.S. at 240 & n. 31, 87 S.Ct. 1926; *Williams*, 477 S.W.2d at 889; *Johnson*, 901 S.W.2d at 534. In determining whether the evidence offered established that the identification was of an independent origin, we consider the following factors:

1) the prior opportunity to observe the alleged criminal act;

2) the existence of any discrepancy between any pretrial lineup identification and the defendant's actual description;

3) any identification prior to the lineup of another person;

4) the identification by picture of the defendant prior to lineup;

5) the failure to identify the defendant on a prior occasion; and

6) the lapse of time between the alleged act and the lineup identification.

*Wade*, 388 U.S. at 241, 87 S.Ct. 1926; *Herrera*, 682 S.W.2d at 318 (adopting *Wade* factors for purpose of assessing independent origin). Although these factors resemble the *Biggers* factors, the *Wade* factors are used for a different purpose—to assess whether the State has sufficiently shown independent origin of the in-court identification testimony.

In *Jimenez v. State*, the court invoked the *Wade* analysis to find that there was no independent origin for an in-court identification. 787 S.W.2d 516, 520 (Tex.App.—El Paso 1990, no pet.). The case against the defendant in *Jimenez*, who was accused of rape, substantially rested on the victim's in-court identification of the defendant as her assailant. *Id.* Applying the *Wade/Herrera* factors in a fact-intensive analysis, *Jimenez* concluded that the witness's in-court identification was not of an independent origin, but rather was the result of pretrial identification procedures that created a substantial likelihood of misidentification. *Id.* at 523. A similar result was reached in *Coleman v. State*, 505 S.W.2d 878, 880 (Tex.Crim.App. 1974); *Proctor*, 465 S.W.2d at 765 and *Rawlings v. State*, 720 S.W.2d 561, 577 (Tex. App.—Austin 1986, writ ref'd).

We reach the same result. Devlin did not have a prior opportunity to view the criminal act itself, but he did have a fleeting opportunity to view the probable culprit immediately after the commission of the crime. This view, though, was from almost 88 feet away for only five seconds in the middle of the night. Devlin failed to identify Loserth prior to the suggestive showing of the photograph. For two-and-one-half months, Devlin could only identify the assailant as "tall and thin" and, finally, under hypnosis, as a "man."

"Clear and convincing evidence" is that evidence which is "so clear as to leave no substantial doubt" and "sufficiently strong to command the unhesitating assent of every reasonable mind." *Spencer*, 466 S.W.2d at 752; *Martinez v. State*, 437 S.W.2d 842, 849 (Tex.Crim.App.1969);*Durrough v. State*, 672 S.W.2d 860, 870 (Tex.App.—Corpus Christi 1984), *rev'd on other grounds*, 693 S.W.2d 404 (Tex.Crim.App.1985). Although Devlin testified that he could have made the in-court identification without the photograph, that statement does not constitute clear and convincing evidence of independent origin. The statement is not "so clear as to leave no substantial doubt."

The State had the burden of showing by "clear and convincing" evidence that the in-court identification was not tainted by the impermissibly suggestive identification procedure but was of "independent origin." We hold that the State failed to do this. Since Loserth met his burden of proving that the impermissibly suggestive procedure used in this case gave rise to a very substantial likelihood of misidentification, the in-court identification should have been suppressed. We sustain the defendant's third point of error.

## IV. CONCLUSION

In accordance with this decision, we do not need to reach the second point of error. We reverse and remand for a new trial.