# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00534-CR

**Robert Lee Brown, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
### NO. 00-2368, HONORABLE MIKE LYNCH, JUDGE PRESIDING

Appellant Robert Lee Brown was indicted on one count of aggravated robbery. *See* Tex. Penal Code Ann. § 29.03 (West 1994). The jury found Brown guilty of the offense, and the trial court assessed the punishment at thirty-two years' imprisonment. On appeal, Brown raises one issue: the trial court erred in denying his motion to suppress the in-court identification by the victim. We will affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 30, 1999, Brown, his girlfriend, Sonya Holder, and two other men planned to rob Pete Arevalo, a sixty-year-old man who owned and operated Arevalo Truck and Automotive. They wanted to steal money and crack cocaine from Arevalo because Brown's cousin was incarcerated and needed money to get out of jail. Holder made her living as a prostitute and had been meeting with Arevalo every week for the past four years to exchange sexual favors for money

and crack cocaine. Holder testified that she considered Arevalo a friend and that he had never hurt her.

Brown and the two other men decided to rob Averalo because Holder said she knew where he kept his money and drugs. Holder agreed to help them get into Arevalo's apartment. On the night of September 30, Holder knocked on Arevalo's door. Arevalo got out of bed and only saw Holder as he looked through the door's peephole. Holder told him that she needed to use the restroom, and he let her into the apartment.

Holder entered the apartment, and the three men followed her. One man said to Arevalo, "We want to sell you a gun." A second man displayed a chrome pistol. Arevalo told the men that he was not interested. Arevalo testified that the first man suddenly punched him and then threw his arms around him. While the first man held Arevalo, the second man pistol-whipped him several times. The second man then pointed the gun at Arevalo's face and asked where he kept his money. Arevalo testified that he swung his body around in order to bring the first man between himself and the second attacker. The two assailants responded by punching and pistol-whipping Arevalo several times. Arevalo finally submitted and told the two men where his money was located.

Arevalo testified that he was suddenly able to free himself from the first man's grasp and ran to his bedroom where he kept a 12-gauge pump shotgun. The bedroom was well lit, and Arevalo said that he could see his assailants coming for him. Another struggle ensued between Arevalo and the two men. Arevalo attempted to fire the shotgun twice, but it misfired each time. The second man assaulted Arevalo with the pistol several more times and took the shotgun from him. The second man then gave the handgun to the first man, who also pistol-whipped Arevalo. The third

2

man yelled that they needed to leave, at which point all three men fled. Before leaving the bedroom, however, the second man pointed the shotgun at Arevalo's stomach. Arevalo testified that the second man attempted to fire the shotgun, but it misfired again. During the robbery, Holder neither aided Arevalo nor participated in the assault.

After the attackers left his apartment, Arevalo dialed 911. The emergency medical services took Arevalo to Brackenridge Hospital for treatment. His injuries included eight lacerations on his head, one deep laceration near his left eye, numerous abrasions on his torso, extensive bruising on his arms, chest, and under his armpits, three chipped teeth, and one tooth severed at the gum line. Arevalo described one assailant as a dark-skinned African-American male and the other as a light-skinned African-American male about eighteen to twenty years old. He told the police that the lighter skinned man was the one who initially pistol-whipped him, took the shotgun from him, and attempted to shoot him. Arevalo later identified this man as Brown. The darker skinned man, who was never identified, also pistol-whipped Arevalo during the struggle.

Shortly after Arevalo made his statement, the police arrested Holder for her involvement in the robbery. She identified the three men with her that night as Robert, Quincy, and Sean. Holder knew Robert because they had been seeing each other for a few months and were having sexual relations and smoking crack cocaine together. Although Holder did not know Robert's last name, she thought he had a brother named Kevin Caldwell. With that information, the police discovered Robert Brown, the half-brother of Kevin Caldwell. Holder positively identified Brown when the police showed her a picture of him.

The police made a photographic lineup containing Brown's photo, which they showed to Arevalo. After Arevalo identified Brown, whom he had previously described as a light-skinned black male, the police issued an arrest warrant for him.

Brown was charged by indictment on April 18, 2000, with the felony offense of aggravated robbery with a deadly weapon, enhanced with five prior felony convictions in a single enhancement paragraph. On May 1, 2000, Brown was arraigned and entered a plea of not guilty. On May 5, 2000, the jury found Brown guilty of the offense of aggravated robbery. Brown elected to have the trial court assess his punishment, and it imposed a prison sentence of thirty-two years.

Brown is a dark-skinned African-American male. He complains that because his picture in the photographic lineup was overexposed, his skin appeared unusually light in complexion. Brown believes that this identification procedure was suggestive and resulted in mistaken identification. Furthermore, he contends that he was chosen by Arevalo because he had the lightest complexion among the other pictures in the lineup. He asserts one point of error: the trial court erred in denying the motion to suppress the in-court identification by the victim.

## STANDARD OF REVIEW

The court of criminal appeals has set forth the standard of review for trial court rulings on motions to suppress evidence based upon Fourth Amendment claims. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We afford almost total deference to a trial court's determination of the facts, especially when the trial court's findings are based on an evaluation of credibility and demeanor. *Id*. We give the same amount of deference to mixed questions of law and

4

fact if the resolution of those ultimate questions turns on an examination of credibility and demeanor. *Id.* If mixed questions of law and fact do not relate to credibility and demeanor, then we review such determinations *de novo*. *Id.*

The standard of review for a ruling on a motion to suppress an in-court identification due to an impermissibly suggestive pretrial identification procedure is the *Guzman* standard. *Loserth v. State*, 963 S.W.2d 770, 771 (Tex. Crim. App. 1998); *Guzman*, 955 S.W.2d at 88-89. Whether a photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor. *Loserth*, 963 S.W.2d at 772-73. Accordingly, we will apply a *de novo* standard.

## DISCUSSION

### *Burden of Proof*

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *Webb v. State*, 760 S.W.2d 263, 272 (Tex. Crim. App. 1988). Determining the admissibility of an in-court identification involves a two-step analysis: (1) whether the out-of-court identification procedure was impermissibly suggestive, and (2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995); *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993); *Cantu v. State*, 738 S.W.2d 249, 251 (Tex. Crim. App. 1987).

5

Each case must be considered on its own facts. *Simmons*, 390 U.S. at 384. Furthermore, the analysis requires an examination of the totality of the circumstances surrounding the identification. *Id*.

The defendant must prove the two elements by clear and convincing evidence. *Barley,* 906 S.W.2d at 33-34; *Delk*, 855 S.W.2d at 706; *Herrera v. State*, 682 S.W.2d 313, 318 (Tex. Crim. App. 1984). If the defendant meets this burden, then the in-court identification is inadmissible unless the State can prove by clear and convincing evidence that the identification was of "independent origin." *United States v. Wade*, 388 U.S. 218, 240 (1967); *Williams v. State*, 477 S.W.2d 885, 889 (Tex. Crim. App. 1972).

When determining the admissibility of identification testimony, reliability is the crux of the matter. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Loserth*, 963 S.W.2d at 772. Testimony is reliable if the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure. *Simmons*, 390 U.S. at 383. In *Neil v. Biggers*, 409 U.S. 188 (1972), the United States Supreme Court enumerated five nonexclusive factors used to assess reliability. They are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id*. at 199-200. We view these five factors in the light most favorable to the trial court's ruling. *Ibarra v. State*, 11 S.W.3d 189, 195-96 (Tex. Crim. App. 1999). The five factors, viewed in this manner, are then reviewed *de novo* against "the corrupting effect" of the suggestive pretrial identification procedure. *Id*.; *Loserth*, 963 S.W.2d at 773-74.

6

*Impermissibly Suggestive Procedure*

Every photographic lineup procedure creates the possibility of misidentification, and a police officer who improperly employs photographic lineups increases the possibility that a witness may err in identifying a perpetrator. A witness may have obtained only a brief glimpse of the criminal or may have seen him under poor lighting conditions. *Simmons*, 390 U.S. at 383. Such a witness may find it difficult to identify the criminal, and improper photographic identification procedures heighten this difficulty, creating a greater margin of error. If a misidentification occurs, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen. *Id.*

However problematic photographic lineups may be, they remain useful. Every photographic lineup must contain individuals who fit the rough description of the suspect; however, it is not essential that all individuals be identical. *Herrera*, 682 S.W.2d at 319; *Dickson v. State*, 492 S.W.2d 267, 271 (Tex. Crim. App. 1973) (stating that "neither due process of law nor common sense" requires such exactitude). To argue the contrary would imply that lineups constitute *per se* violations of due process. *See Biggers*, 409 U.S. at 198; *Clemons v. United States*, 408 F.2d 1230, 1251 (D.C. Cir. 1968).

There are numerous examples of what does and does not constitute impermissible suggestiveness. For example, a lineup that consists of five persons, two of whom have beards and who are not physically close to the defendant in size and hair color, is not impermissibly suggestive. *Turner v. State*, 600 S.W.2d 927, 932 (Tex. Crim. App. 1980). The same holds true even if an

defendant appears older than the other persons in the lineup. *Williams v. State*, 675 S.W.2d 754, 757 (Tex. Crim. App. 1984). On the other hand, a lineup will be impermissibly suggestive if the defendant was the only white male in the spread and the other pictures were of Mexican-American males. *Tapley v. State*, 673 S.W.2d 284, 286 (Tex. App.—San Antonio 1984, pet. ref'd). Suggestiveness may also be created by the manner in which the pretrial identification procedure is conducted, such as police pointing out the suspect or suggesting that a suspect is included in the line-up or photo array. *Rogers v. State*, 774 S.W.2d 247, 260 (Tex. Crim. App. 1989). Finally, the use of a lone photograph, without any of the traditional safeguards of a lineup, is inherently suspect. *Loserth v. State*, 985 S.W.2d 536, 543 (Tex. App.—San Antonio 1998, pet. ref'd) (op. on remand).

In the case at bar, we must consider whether the photograph of Brown used in the lineup, which he complains was overexposed, is impermissibly suggestive in that it is easily distinguishable from the other photographs in the lineup. Brown further asserts that the investigating officer used an overexposed photograph in the lineup to coincide with the description of Brown given by Arevalo as a "light-skinned black male."

While in every instance, the trial court's assessment of the suggestive nature of the actual photographic lineup used by the police will be purely subjective, the remark of the trial judge here is worth noting:

> I'm looking at [the defendant in photo number two] very carefully here, and I don't see how it stands out. [It's] obvious that some light is hitting two, three, five, and six on the forehead, and to a lesser degree one, and one looks darker than two, and three looks a little tanner. . .[but] two and five are close. One and six are close. I don't see how two particularly stands out.

8

This comment is an accurate description of the lineup. Brown's picture, though overexposed, is virtually indistinguishable from the others used in the array. Six men were depicted in the lineup. Each individual in the lineup is a young African-American male with short hair. The men all have comparable facial features. The clothing worn is similar, apparently jail uniforms, and all of the photographs have similar backgrounds. Finally, light is striking the faces of most of the men, giving them an appearance of overexposure. Furthermore, the record shows that the police officers never told Arevalo that a suspect was included in the photographic line-up; Arevalo identified Brown independently. Thus, we conclude that the photographic array was not impermissibly suggestive.

### *Likelihood of Irreparable Misidentification*

However, assuming for the sake of argument that the photographic lineup was impermissibly suggestive, we will next determine whether that fact creates a very substantial likelihood of irreparable misidentification. In conducting this analysis, we look to the five *Biggers* factors for guidance. *See Biggers*, 409 U.S. at 199-200. The court of criminal appeals has held that we are to treat the *Biggers* factors as issues of fact and review them in a light most favorable to the trial court's ruling. *Loserth*, 963 S.W.2d at 773. If sufficient indicia of reliability are present, then the courtroom identification is admissible. *Barley v. State*, 906 S.W.2d 27, 34 (Tex. Crim. App. 1995). It is Brown's burden to prove by clear and convincing evidence that the identification has been irreparably tainted. *Id*.

First, we must ask whether Arevalo had an adequate opportunity to view the offenders at the time of the crime. Arevalo testified that the struggle with his assailants lasted for several

9

minutes. A significant portion of this struggle occurred in Arevalo's bedroom, which was well lit. Arevalo testified that he saw Brown's face during the ordeal and particularly focused on it while in the bedroom. Brown's face was neither covered by a mask nor distorted by poor lighting conditions.

We must also consider Arevalo's degree of attention. Although Arevalo was sleeping when Holder arrived at his residence, he possessed enough attentiveness to recognize Holder. During the struggle, Arevalo stood face-to-face with his assailants and tried to defend himself repeatedly. Arevalo testified that Brown's face was one he would never forget. Witnesses who are victims, rather than casual observers, are generally believed to have a greater degree of attention. *See Manson*, 432 U.S. at 115; *Barley*, 906 S.W.2d at 35; *Loserth*, 985 S.W.2d at 544.

Next, we examine the accuracy of Arevalo's prior description of Brown. Arevalo described his assailants in terms of their skin tone. One assailant was a "light-skinned black male about eighteen to twenty years old" and the other was a "dark-skinned black male." We acknowledge that these descriptions are very general and could match the profiles of most African-American men.

The fourth *Biggers* factor concerns the level of certainty demonstrated by the witness at the confrontation. When the police presented Arevalo with the photographic lineup, he promptly identified Brown as one of the assailants. Arevalo never wavered in his certainty and consistently identified Brown both inside and outside of court.

Finally, we must assess the length of time between the crime and the confrontation. The aggravated robbery occurred on September 30, 1999, and Arevalo's in-court confrontation with Brown occurred on May 2, 2000. This period of eight months had no detrimental effect on the accuracy or consistency of Arevalo's identification. Such a period of time will not destroy reliability

when a witness's recollections are consistent. *See Barley*, 906 S.W.2d at 35; *see also Delk*, 855 S.W.2d at 707. We conclude that the facts of this case, viewed in the light most favorable to the trial court's ruling, sufficiently satisfy each of the *Biggers* factors, except the accuracy of Arevalo's prior description.

***Corrupting Effect of the Pretrial Identification Procedure***

Having reviewed the *Biggers* factors, we now weigh those factors against the corrupting effect of the pretrial identification procedure. *See Loserth,* 963 S.W.2d at 774. The inquiry above reveals only one factor for us to consider: the accuracy of Arevalo's prior description.

A witness who gives a vague prior description does not make an identification procedure impermissibly suggestive. Rather, an impermissibly suggestive identification procedure could produce irreparable misidentification because the witness might be coaxed into identifying someone based on vague characteristics. An excellent analysis of this problem appears in the court of appeal's opinion on remand in *Loserth*. *See Loserth*, 985 S.W.2d at 536. In that case, a young woman was brutally murdered by an intruder in her apartment. *Id*. at 538. Around 3:40 a.m., Lewis Devlin, a neighbor who lived in the adjacent apartment building, heard a scream and called the police. *Id*. Shortly thereafter, he attempted to locate the origin of the scream by staring out of his window. *Id*. Devlin noticed that the victim's apartment was lit. *Id*. He saw a tall, thin person walk onto the victim's balcony and then leap off of it. *Id*. Devlin observed these events from a distance of eighty-eight feet. *Id*. In *Loserth,* Devlin described the criminal as "a tall, thin person, wearing dark clothes." *Id*. at 544. A month later, the witness underwent hypnosis and identified the criminal as a man. *Id*.

11

at 545. These descriptions never specified the ethnicity of the criminal. *Id*. at 546. However, when Devlin was shown a single photograph of the suspect, he maintained with certitude that this was the criminal. *Id*. at 547. The court of appeals held that this suggestive procedure had a corrupting effect on the witness. *Id*. at 547.

The case at bar is distinguishable from *Loserth*. First, Arevalo made physical contact with the assailants in a lighted room for a period of several minutes. During the struggle, Arevalo stared into his attackers' faces. Devlin, by contrast, saw the criminal in the dark from eighty-eight feet away while in his own apartment. *Id*. at 538. Second, Arevalo specified the gender, approximate age, ethnicity, and skin tone of his assailants. Although "light-skinned black male about eighteen to twenty years old" is a general description, it is far more specific than Devlin's observation, which could include either gender and any racial group. Third, Arevalo picked Brown out of a photographic lineup; Devlin, by contrast, was shown only a single picture. *Id*. at 539-40. Fourth, and most importantly, Arevalo consistently identified Brown as one of his assailants. In *Loserth*, Devlin made the dramatic change from virtually no memory to complete certitude. *Id*. at 547. Weighing the *Biggers* factors against the corrupting effect of the hypothetically suggestive pretrial identification, we conclude that no substantial risk of irreparable misidentification was created and that the in-court identification was admissible. Accordingly, Brown's single point of error is overruled.

**CONCLUSION**

12

Having concluded that the trial court did not err in denying Brown's motion to suppress the in-court identification by the victim, we affirm the trial court's judgment.

_____

David Puryear, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed

Filed:   July 26, 2001

Publish