

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00279-CR

TRAYSON L. WOODEN                                         APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In three points, Appellant Trayson L. Wooden appeals his conviction for robbery by threats. We affirm.

### II. Factual and Procedural Background

The State indicted Wooden for the robbery of Jennifer Whitus, who testified that she arrived home from work at around 1:00 a.m. on April 24, 2008,

---

[1]*See* Tex. R. App. P. 47.4.

and parked in her usual spot near the well lit entrance to her apartment. When she exited her car, a man approached her "very quickly, very purposefully," and aggressively. He said, "Give me your purse, bitch, or I will shoot you." Whitus testified that she was frozen as the man jerked her purse from her and shoved her down and that she saw him get into the passenger side of a four-door sedan "that had been waiting there with the engine running and the passenger door open." Whitus got a "good look" at his face and described him to the responding police officers as an African American man over six feet tall and about 180 pounds[2] with a bushy hairdo or "an Afro" and a splotchy complexion. She also described him as having either a wide gap between his teeth or a missing or rotten tooth.

On April 28, 2008, Fort Worth police officers arrested Gregory Wofford, Wooden's cousin, at Wofford's home for a parole violation. They found Wooden inside the house along with several of Whitus's personal belongings, including her identification card, and when Wooden failed to properly identify himself, officers arrested him as well. That same day, Fort Worth Police Detective Billy Randolph interviewed Whitus and showed her a photographic lineup from which Whitus identified Wooden as her assailant.

The trial court held a pretrial hearing after Wooden moved to suppress Whitus's upcoming in-court identification of Wooden, claiming that the

---

[2]Whitus noted that it was hard to tell exactly because he was wearing a large shirt and it was windy.

photospread on which her identification would be based was unduly suggestive because Wooden's photograph had a green background, while the others had blue or gray backgrounds.

During the hearing, Detective Randolph testified that he created the photospread by selecting photographs of six individuals, including Wooden, with similar height, weight, gender, race, hair color, and eye color characteristics. Detective Randolph also testified that, before revealing the photospread to Whitus, he advised her that it would contain photographs of individuals with similar characteristics, that her assailant may or may not be pictured, and that she should concentrate on facial features because hair styles and clothing could have changed. According to Detective Randolph, Whitus pointed to Wooden's photograph within five to ten seconds, and Detective Randolph wrote "[p]icked immediately" on the photospread. Detective Randolph testified that the background of Wooden's photograph was green but that each photograph had a different background color, which he could not adjust. For purposes of the hearing, the trial court admitted the photospread and photospread data, which listed the photographed individuals' weight, ranging from 160 to 180 pounds, and height, ranging from five feet, nine inches to six feet, three inches.[3]

---

[3]The trial court also admitted a photograph that, according to Whitus's testimony, showed that Wooden's face was lighter in some areas and darker in others, and a photograph that showed that Wooden had a missing tooth.

3

Whitus testified during the hearing that she identified Wooden almost instantly but selected Wooden's photograph between thirty and sixty seconds later to "look at the pictures carefully" and "ma[k]e sure to look over all of them, even though [her] eyes were drawn to the familiar face."[4] Whitus then identified Wooden in open court as the person who robbed her and stated that she based her identification, not on the photospread, but on her "observations of him at the time of the offense."[5] At the conclusion of the hearing, the trial court denied Wooden's motion to suppress but granted his request for a running objection to the in-court identification.

At trial, the jury viewed the photospread and heard testimony from Whitus, Detective Randolph, other police officers, and Mason, the hairdresser, before Wofford testified pursuant to a plea bargain with the State. Wofford said that he drove Wooden to and from the scene of the robbery, that he remembered watching Wooden rob a woman, and that he saw her identification card among the items that Wooden stole from her. A jury found Wooden guilty and assessed

---

[4]During trial, Whitus testified that, because she recognized Wooden's face, she was able to identify him even though he had a different hair style in the photospread than she had originally described. Geleatha Mason, a hairdresser, testified that Wooden's hair in the photospread was in "cornrows or braids" and estimated that it takes approximately twenty minutes to break down cornrows such that the hair returns to an Afro style.

[5]After the trial court admitted Whitus's in-court identification, Whitus testified that, during her interview with Detective Randolph, she described her assailant as weighing about 200 pounds, having a "bushy Afro" and freckles, and missing a tooth.

twenty-five years' confinement as his punishment, and the trial court sentenced him accordingly. This appeal followed.

### III. Identification

In his first point, Wooden complains that the trial court erred by denying his motion to suppress evidence relating to his pretrial identification because the photospread from which Whitus identified him was impermissibly suggestive. In his second point, he argues that the trial court erred by overruling his objection to the in-court identification because it was tainted by the impermissibly suggestive photospread.

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that use of that identification at trial would deny the accused of due process. *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001). When examining a pretrial or an in-court identification, we use a two-prong test. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995), *cert. denied*, 516 U.S. 1176 (1996). First, we determine whether the defendant has shown by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive, and, if so, we will reverse only if the suggestiveness gives rise to a very substantial likelihood of misidentification. *Id.* at 33–34 (considering the totality of the circumstances).

Under the first *Barley* prong, suggestiveness may be created by the manner in which the pretrial identification procedure is conducted if, for example, a police officer suggests that the suspect's photograph is included in the

5

photospread, or it may be created by the content of the photospread itself "if the suspect is the only individual closely resembling the pre-procedure description." *Id.* at 33; *see Mungia v. State*, 911 S.W.2d 164, 168 (Tex. App.—Corpus Christi 1995, no pet.) ("[A] photo spread is not improperly suggestive merely because each photograph can be distinguished in some manner from the defendant's.").

Under the second *Barley* prong, we weigh the following five nonexclusive *Biggers* factors against the corrupting effect of a suggestive identification procedure: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008) ("Reliability is the linchpin in determining the admissibility of identification testimony.") (citing *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972)), *cert. denied*, 130 S. Ct. 72 (2009). We review de novo whether an identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification, but we view historical issues of fact in the light most favorable to the trial court's ruling. *Cienfuegos v. State*, 113 S.W.3d 481, 491 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (citing *Loserth v. State*, 963 S.W.2d 770, 773–74 (Tex. Crim. App. 1998) (stating that the *Biggers* factors are treated as historical issues of fact)).

## A. First *Barley* Prong—Suggestiveness

Wooden asserts that his photograph's green background was markedly different from the blue or gray backgrounds of the other photographs and, thus, attracted a level of attention that rendered the photospread impermissibly suggestive. We have reviewed the photospread, which shows that the background of Wooden's photograph is green and that the backgrounds of the other photographs are different shades of blue or gray. However, this discrepancy is slight. *See Barley*, 906 S.W.2d at 33–34 (holding that a photospread containing a photograph that was "obviously taken in a different setting" was not impermissibly suggestive); *Page v. State*, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ("Slight differences in the background color and brightness of photographs are insignificant."); *see also Mata v. State*, No. 04-07-00146-CR, 2008 WL 2715869, at *4 (Tex. App.—San Antonio July 9, 2008, pet. ref'd) (mem. op., not designated for publication) (concluding that a gray background was permissible even though the other backgrounds were light blue). This difference in background color does not create a photospread in which "the suspect is the only individual closely resembling the pre-procedure description." *See Barley*, 906 S.W.2d at 33; *see also Doescher v. State*, 578 S.W.2d 385, 387 (Tex. Crim. App. [Panel Op.] 1978) (concluding that the photographic spread was not impermissibly suggestive when appellant's photograph was the only one with a height indicator in the background because this did not suggest that he had a characteristic that the

7

other subjects did not share). Instead, Detective Randolph ensured that the content of his photospread featured six individuals with similar characteristics with regard to height, weight, gender, race, hair color, and eye color. *See Barley*, 906 S.W.2d at 33. Indeed, our review of the photospread and the photospread data confirms that the six African American males pictured have similar height and weight, black hair of a similar style, brown eyes, and similar facial features.

Further, Detective Randolph ensured that the pretrial identification procedure was not suggestive by advising Whitus that the photospread would include six individuals with similar characteristics, and he directed Whitus to focus on facial features because, unlike hair and clothing, those are unlikely to change with time. *See id.* And Whitus testified that she selected Wooden's photograph, not based on its background, but because her eyes were drawn to his familiar face. *See Doescher*, 578 S.W.2d at 387 (noting that part of the totality of the circumstances included testimony that the witnesses' identification of appellant was primarily based on their observations during the crime rather than on the photospread); *Bethune v. State*, 821 S.W.2d 222, 229 (Tex. App.—Houston [14th Dist.] 1991) (concluding that photospread was not impermissibly suggestive when complainant testified that her selection was based solely on her memory of her attack and that the defendant's facial features set his photograph apart from the others), *aff'd*, 828 S.W.2d 14 (Tex. Crim. App. 1992). Also, even if the green background caught Whitus's attention initially, she stated that she made sure to look over all of the photographs for thirty to sixty seconds before

8

finally choosing Wooden's. *See Smith v. State*, No. 05-02-01886-CR, 2003 WL 22962434, at *4 (Tex. App.—Dallas Dec. 17, 2003, pet. ref'd) (not designated for publication) (deciding that the identification was reliable in part because the witness looked at the lineup for several seconds before choosing a photograph). Finally, Detective Randolph advised Whitus that her assailant might not be pictured at all. *See Mata*, 2008 WL 2715869, at *4 (noting that the police officer never suggested that the suspect was included in the photospread) (citing *Barley*, 906 S.W.2d at 33).

Considering the totality of the circumstances, including the content of the photospread itself and the manner in which Detective Randolph conducted the pretrial identification procedure, Wooden has not shown by clear and convincing evidence that the in-court identification was tainted by an impermissibly suggestive identification procedure. *See Barley*, 906 S.W.2d at 33–34.

## B.  Second *Barley* Prong—Likelihood of Misidentification

Even if the pretrial identification procedure was impermissibly suggestive under the first *Barley* prong, it must also give rise to a very substantial likelihood of misidentification to deny Wooden of due process. *See Conner*, 67 S.W.3d at 200; *Barley*, 906 S.W.2d at 33–34.  Turning to the first and second *Biggers* factors, Whitus's description of the incident shows that she had a sufficient opportunity to view and pay close attention to her assailant during and after the incident. *See Luna*, 268 S.W.3d at 605.  First, Whitus testified that the area in which she was attacked was well lit, so she was able to get a "good look" at her

9

assailant's face. *See Loserth v. State*, 985 S.W.2d 536, 544 (Tex. App.—San Antonio 1998, pet. ref'd) (deferring to trial court's finding that witness had adequate opportunity to observe the defendant when the area was well lit and the victim testified about seeing the defendant's face). Further, even though she was "frozen," the level of detail that she recalled demonstrated that she was very attentive during the robbery. *See Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App.) (using the level of detail recalled by the witness as a measure of her attentiveness), *cert. denied*, 510 U.S. 982 (1993). For example, Whitus observed that her assailant's approach was quick, purposeful, and aggressive, and she distinctly remembered what he said to her before he jerked her purse from her shoulder and pushed her down. Additionally, Whitus had the wherewithal to observe her assailant as he escaped and was able to describe the type of get-away vehicle, where it was parked, that its engine was running, and that its passenger door was open.

Turning to the third *Biggers* factor, Whitus's prior description of her assailant was precise and added to the reliability of her identification. *See Luna*, 268 S.W.3d at 605. Her description of her assailant as being an African American male over six feet tall with a missing or rotten tooth was accurate in all three respects. Beyond these characteristics, although Whitus described Wooden's hair as bushy or "an Afro" and the photograph shows Wooden's hair in cornrows, viewing the evidence in the light most favorable to the trial court's ruling, Whitus's description was accurate because, as the trial court heard

10

Detective Randolph state, hair styles are susceptible to change. *See Loserth*, 963 S.W.2d at 773–74 (instructing that we view these factors with deference in the light most favorable to the trial court's ruling). Moreover, another witness testified that it only takes about twenty minutes to convert cornrows back into an Afro hair style.

Next, even though Whitus's estimation of Wooden's weight was slightly different when she spoke with Detective Randolph from her description on the day of the incident, when viewed in the appropriate light, this discrepancy did not render Whitus's description inaccurate. *See id.* at 773–74. Indeed, as Whitus testified, the difficulty of gauging someone's weight was compounded by her assailant's baggy clothes blowing in the wind. The trial court could have reasonably put more weight on Whitus's first and more accurate estimate the night of the attack that her assailant weighed approximately 180 pounds.

In addition, even though Whitus's description of Wooden's complexion varied between "splotchy" and "freckled," Whitus's description was still accurate in this respect when viewed in the appropriate light. *See id.* Indeed, Whitus testified that she used the term "freckles" on one occasion to describe an inconsistency or unevenness in her assailant's face. The trial court could have interpreted this testimony to indicate not that she was inconsistent in her description but merely that she struggled with how to convey the physical characteristic that she had observed. As further evidence of reliability, the trial

11

court had an opportunity to review the photograph that Whitus later testified showed that Wooden's face was darker in some areas and lighter in others.

Turning to the fourth *Biggers* factor, Whitus exhibited a high level of certainty when she selected Wooden's photograph at the confrontation. *See Luna*, 268 S.W.3d at 605. Both she and Detective Randolph testified that she recognized her assailant instantly; the only discrepancy between their testimonies was whether she pointed to Wooden's photograph at that moment or took additional time to carefully examine each photograph. Either way, viewing the evidence in the appropriate light, the trial court could have found that this evidence supported a finding that Whitus was highly confident in her identification of Wooden. *See Loserth*, 963 S.W.2d at 773–74. Finally, turning to the fifth factor, the length of time between the April 24 robbery and the April 28 confrontation was four days, which strengthened the reliability of Whitus's identification. *See Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 2253–54 (1977) ("The photographic identification took place only two days later. We do not have here the passage of weeks or months between the crime and the viewing of the photograph.").

In sum, we conclude that Wooden has not shown by clear and convincing evidence that the photospread was impermissibly suggestive, and the trial court could have reasonably found that each *Biggers* factor weighed in favor of reliability even if the photospread was impermissibly suggestive. *See Biggers*, 409 U.S. at 199–200, 93 S. Ct. at 382; *Loserth*, 963 S.W.2d at 773–74; *Barley*,

12

906 S.W.2d at 33–34. Therefore, we hold that any suggestiveness did not deprive Wooden of due process by giving rise to a very substantial likelihood of misidentification, *see Biggers*, 409 U.S. at 199–200, 93 S. Ct. at 382; *Conner*, 67 S.W.3d at 200, and we overrule Wooden's first and second points.

## IV. Accomplice Witness

In his third point, Wooden complains that, absent the impermissibly suggestive photospread and the tainted in-court identification, insufficient evidence existed to corroborate Wofford's accomplice testimony. Wooden implicitly concedes that sufficient evidence would exist if, as we have determined, the photospread was not impermissibly suggestive and, thus, did not taint the in-court identification. However, we will still address the sufficiency in light of our decision on Wooden's first two points. *See Green v. State*, No. 07-00-0586-CR, 2002 WL 31084674, at *2–3 (Tex. App.—Amarillo Sept. 17, 2002, no pet.) (not designated for publication) (addressing the accomplice testimony issue even though appellant only based this claim on the alleged inadmissibility of the in-court identification, which the trial court held to be admissible).

The code of criminal procedure provides that a conviction cannot be based upon the testimony of an accomplice unless other evidence tending to connect the defendant with the offense corroborates the testimony. Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). "[N]on-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Smith v. State*, 332 S.W.3d 425,

442 (Tex. Crim. App. 2011) ("Therefore, it is not appropriate for appellate courts to independently construe the non-accomplice evidence.").

In addition to Whitus's pretrial and in-court identification of Wooden, corroborating Wofford's testimony at trial was Whitus's testimony that, in the well lit parking lot, she got a "good look" at her attacker, who she initially told police was an African American male who stood over six feet tall, had a bushy hairdo, weighed about 180 pounds, had a missing or rotten tooth, and had a splotchy complexion. Also corroborating Wofford's testimony was evidence that Fort Worth police officers found Wooden in the same house as the one from which they recovered Whitus's identification card. The only contradicting evidence was Whitus's statement during a subsequent interview with police that her attacker weighed about 200 pounds. However, we must defer to the jury's resolution of this inconsistency and not independently construe the evidence. *See id.* We conclude that rational jurors could have found that the combined weight of the non-accomplice evidence—including Whitus's almost instantaneous pretrial identification, her in-court identification, the detailed description that she gave to responding police officers, and the evidence that police found Wooden and Whitus's identification card in Wofford's house—tended to connect Wooden to the offense. *See id.* Thus, we overrule Wooden's third point.

14

## V. Conclusion

Having overruled all of Wooden's points, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, DAUPHINOT, and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  December 8, 2011