02-10-279-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00279-CR

 

 


 
 
 TRAYSON L. WOODEN
 
 
  
 
 
 APPELLANT
 
 


                                                                                                                             

V.

 


 
 
 THE
 STATE OF TEXAS
 
 
  
 
 
 STATE
 
 


 

 

------------

 

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

I.  Introduction

In three points, Appellant Trayson L.
Wooden appeals his conviction for robbery by threats.  We affirm.

II.  Factual and Procedural
Background

The State indicted Wooden for the
robbery of Jennifer Whitus, who testified that she arrived home from work at
around 1:00 a.m. on April 24, 2008, and parked in her usual spot near the well lit
entrance to her apartment.  When she exited her car, a man approached her “very
quickly, very purposefully,” and aggressively.  He said, “Give me your purse,
bitch, or I will shoot you.”  Whitus testified that she was frozen as the man jerked
her purse from her and shoved her down and that she saw him get into the
passenger side of a four-door sedan “that had been waiting there with the
engine running and the passenger door open.”  Whitus got a “good look” at his
face and described him to the responding police officers as an African American
man over six feet tall and about 180 pounds[2]
with a bushy hairdo or “an Afro” and a splotchy complexion.  She also described
him as having either a wide gap between his teeth or a missing or rotten tooth.

On April 28, 2008, Fort Worth police
officers arrested Gregory Wofford, Wooden’s cousin, at Wofford’s home for a
parole violation.  They found Wooden inside the house along with several of Whitus’s
personal belongings, including her identification card, and when Wooden failed
to properly identify himself, officers arrested him as well.  That same day,
Fort Worth Police Detective Billy Randolph interviewed Whitus and showed her a
photographic lineup from which Whitus identified Wooden as her assailant.

The trial court held a pretrial
hearing after Wooden moved to suppress Whitus’s upcoming in-court
identification of Wooden, claiming that the photospread on which her
identification would be based was unduly suggestive because Wooden’s photograph
had a green background, while the others had blue or gray backgrounds.

During the hearing, Detective
Randolph testified that he created the photospread by selecting photographs of
six individuals, including Wooden, with similar height, weight, gender, race,
hair color, and eye color characteristics.  Detective Randolph also testified
that, before revealing the photospread to Whitus, he advised her that it would
contain photographs of individuals with similar characteristics, that her
assailant may or may not be pictured, and that she should concentrate on facial
features because hair styles and clothing could have changed.  According to Detective
Randolph, Whitus pointed to Wooden’s photograph within five to ten seconds, and
Detective Randolph wrote “[p]icked immediately” on the photospread.  Detective
Randolph testified that the background of Wooden’s photograph was green but
that each photograph had a different background color, which he could not
adjust.  For purposes of the hearing, the trial court admitted the photospread
and photospread data, which listed the photographed individuals’ weight,
ranging from 160 to 180 pounds, and height, ranging from five feet, nine inches
to six feet, three inches.[3]

Whitus testified during the hearing that
she identified Wooden almost instantly but selected Wooden’s photograph between
thirty and sixty seconds later to “look at the pictures carefully” and “ma[k]e
sure to look over all of them, even though [her] eyes were drawn to the
familiar face.”[4] 
Whitus then identified Wooden in open court as the person who robbed her and
stated that she based her identification, not on the photospread, but on her “observations
of him at the time of the offense.”[5] 
At the conclusion of the hearing, the trial court denied Wooden’s motion to
suppress but granted his request for a running objection to the in-court
identification.

At trial, the jury viewed the photospread
and heard testimony from Whitus, Detective Randolph, other police officers, and
Mason, the hairdresser, before Wofford testified pursuant to a plea bargain
with the State.  Wofford said that he drove Wooden to and from the scene of the
robbery, that he remembered watching Wooden rob a woman, and that he saw her identification
card among the items that Wooden stole from her.  A jury found Wooden guilty
and assessed twenty-five years’ confinement as his punishment, and the trial
court sentenced him accordingly.  This appeal followed.

III.  Identification

In his first point, Wooden complains
that the trial court erred by denying his motion to suppress evidence relating
to his pretrial identification because the photospread from which Whitus
identified him was impermissibly suggestive.  In his second point, he argues
that the trial court erred by overruling his objection to the in-court
identification because it was tainted by the impermissibly suggestive photospread.

A pretrial identification procedure
may be so suggestive and conducive to mistaken identification that use of that
identification at trial would deny the accused of due process.  Conner v.
State, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001).  When examining a
pretrial or an in-court identification, we use a two-prong test.  Barley v.
State, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995), cert. denied, 516
U.S. 1176 (1996).  First, we determine whether the defendant has shown by clear
and convincing evidence that the pretrial identification procedure was
impermissibly suggestive, and, if so, we will reverse only if the
suggestiveness gives rise to a very substantial likelihood of
misidentification.  Id. at 33–34 (considering the totality of the
circumstances).

Under the first Barley prong,
suggestiveness may be created by the manner in which the pretrial identification
procedure is conducted if, for example, a police officer suggests that the
suspect’s photograph is included in the photospread, or it may be created by
the content of the photospread itself “if the suspect is the only individual
closely resembling the pre-procedure description.” 
Id. at 33; see Mungia v. State,
911 S.W.2d 164, 168 (Tex. App.—Corpus Christi 1995, no pet.) (“[A] photo spread
is not improperly suggestive merely because each photograph can be
distinguished in some manner from the defendant’s.”).

Under the second Barley prong,
we weigh the following five nonexclusive Biggers factors against the
corrupting effect of a suggestive identification procedure: (1) the opportunity
of the witness to view the criminal at the time of the crime, (2) the witness’s
degree of attention, (3) the accuracy of the witness’s prior description of the
criminal, (4) the level of certainty demonstrated by the witness at the
confrontation, and (5) the length of time between the crime and the
confrontation.  Luna v. State, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008)
(“Reliability is the linchpin in determining the admissibility of
identification testimony.”) (citing Neil v. Biggers, 409 U.S. 188, 199–200,
93 S. Ct. 375, 382 (1972)), cert. denied, 130 S. Ct. 72 (2009).  We review
de novo whether an identification procedure was so impermissibly suggestive as
to give rise to a very substantial likelihood of misidentification, but we view
historical issues of fact in the light most favorable to the trial court’s
ruling.  Cienfuegos v. State, 113 S.W.3d 481, 491 (Tex. App.—Houston
[1st Dist.] 2003, pet. ref’d) (citing Loserth v. State, 963 S.W.2d 770,
773–74 (Tex. Crim. App. 1998) (stating that the Biggers factors are
treated as historical issues of fact)).

 

A.  First Barley Prong—Suggestiveness

Wooden asserts that his photograph’s green
background was markedly different from the blue or gray backgrounds of the
other photographs and, thus, attracted a level of attention that rendered the
photospread impermissibly suggestive.  We have reviewed the photospread, which
shows that the background of Wooden’s photograph is green and that the
backgrounds of the other photographs are different shades of blue or gray.  However,
this discrepancy is slight.  See Barley, 906 S.W.2d at 33–34
(holding that a photospread containing a photograph that
was “obviously taken in a different setting” was not impermissibly
suggestive); Page v. State, 125 S.W.3d 640, 647
(Tex. App.—Houston [1st Dist.] 2003, pet. ref’d) (“Slight differences in the background color and brightness of photographs
are insignificant.”); see also Mata v. State, No. 04-07-00146-CR,
2008 WL 2715869, at *4 (Tex. App.—San Antonio July 9, 2008, pet. ref’d) (mem.
op., not designated for publication) (concluding that a gray background was
permissible even though the other backgrounds were light blue).  This difference
in background color does not create a photospread in which “the suspect is the
only individual closely resembling the pre-procedure description.”  See Barley,
906 S.W.2d at 33; see also Doescher v. State, 578 S.W.2d 385, 387 (Tex.
Crim. App. [Panel Op.] 1978) (concluding that the photographic spread was not
impermissibly suggestive when appellant’s photograph was the only one with a
height indicator in the background because this did not suggest that he had a
characteristic that the other subjects did not share).  Instead, Detective
Randolph ensured that the content of his photospread featured six individuals
with similar characteristics with regard to height, weight, gender, race, hair
color, and eye color.  See Barley, 906 S.W.2d at 33.  Indeed, our review
of the photospread and the photospread data confirms that the six African
American males pictured have similar height and weight, black hair of a similar
style, brown eyes, and similar facial features.

Further, Detective Randolph ensured
that the pretrial identification procedure was not suggestive by advising Whitus
that the photospread would include six individuals with similar characteristics,
and he directed Whitus to focus on facial features because, unlike hair and
clothing, those are unlikely to change with time.  See id.  And Whitus testified
that she selected Wooden’s photograph, not based on its background, but because
her eyes were drawn to his familiar face.  See Doescher, 578 S.W.2d at
387 (noting that part of the totality of the circumstances included testimony
that the witnesses’ identification of appellant was primarily based on their
observations during the crime rather than on the photospread); Bethune v. State, 821 S.W.2d 222, 229 (Tex. App.—Houston
[14th Dist.] 1991) (concluding that photospread was not impermissibly
suggestive when complainant testified that her selection was based solely on
her memory of her attack and that the defendant’s facial features set his photograph
apart from the others), aff’d, 828 S.W.2d 14 (Tex. Crim. App. 1992).  Also, even if the green background
caught Whitus’s attention initially, she stated that she made sure to look over
all of the photographs for thirty to sixty seconds before finally choosing Wooden’s. 
See Smith v. State, No. 05-02-01886-CR, 2003 WL 22962434, at *4 (Tex.
App.—Dallas Dec. 17, 2003, pet. ref’d) (not designated for publication)
(deciding that the identification was reliable in part because the witness
looked at the lineup for several seconds before choosing a photograph).  Finally,
Detective Randolph advised Whitus that her assailant might not be pictured at
all.  See Mata, 2008 WL 2715869, at *4 (noting that the police officer
never suggested that the suspect was included in the photospread) (citing Barley,
906 S.W.2d at 33).

Considering the totality of the
circumstances, including the content of the photospread itself and the manner
in which Detective Randolph conducted the pretrial identification procedure, Wooden
has not shown by clear and convincing evidence that the in-court identification
was tainted by an impermissibly suggestive identification procedure.  See Barley,
906 S.W.2d at 33–34.

B.  Second Barley Prong—Likelihood
of Misidentification 

Even if the pretrial identification
procedure was impermissibly suggestive under the first Barley prong, it
must also give rise to a very substantial likelihood of misidentification to
deny Wooden of due process.  See Conner, 67 S.W.3d at 200; Barley,
906 S.W.2d at 33–34.  Turning to the first and second Biggers factors, Whitus’s
description of the incident shows that she had a sufficient opportunity to view
and pay close attention to her assailant during and after the incident.  See
Luna, 268 S.W.3d at 605.  First, Whitus testified that the area in which
she was attacked was well lit, so she was able to get a “good look” at her
assailant’s face.  See Loserth v. State, 985 S.W.2d 536, 544
(Tex. App.—San Antonio 1998, pet. ref’d) (deferring to trial court’s finding
that witness had adequate opportunity to observe the defendant when the area
was well lit and the victim testified about seeing the defendant’s face).  Further,
even though she was “frozen,” the level of detail that she recalled
demonstrated that she was very attentive during the robbery.  See Delk v.
State, 855 S.W.2d 700, 706 (Tex. Crim. App.) (using the level of detail
recalled by the witness as a measure of her attentiveness), cert. denied,
510 U.S. 982 (1993).  For example, Whitus observed that her assailant’s
approach was quick, purposeful, and aggressive, and she distinctly remembered what
he said to her before he jerked her purse from her shoulder and pushed her
down.  Additionally, Whitus had the wherewithal to observe her assailant as he
escaped and was able to describe the type of get-away vehicle, where it was
parked, that its engine was running, and that its passenger door was open.

Turning to the third Biggers
factor, Whitus’s prior description of her assailant was precise and added to
the reliability of her identification.  See Luna, 268 S.W.3d at 605. 
Her description of her assailant as being an African American male over six
feet tall with a missing or rotten tooth was accurate in all three respects.  Beyond
these characteristics, although Whitus described Wooden’s hair as bushy or “an
Afro” and the photograph shows Wooden’s hair in cornrows, viewing the evidence
in the light most favorable to the trial court’s ruling, Whitus’s description
was accurate because, as the trial court heard Detective Randolph state, hair styles
are susceptible to change.  See Loserth, 963 S.W.2d at 773–74
(instructing that we view these factors with deference in the light most
favorable to the trial court’s ruling).  Moreover, another witness testified
that it only takes about twenty minutes to convert cornrows back into an Afro hair
style.

Next, even though Whitus’s estimation
of Wooden’s weight was slightly different when she spoke with Detective
Randolph from her description on the day of the incident, when viewed in the
appropriate light, this discrepancy did not render Whitus’s description
inaccurate.  See id. at 773–74.  Indeed, as Whitus testified, the difficulty
of gauging someone’s weight was compounded by her assailant’s baggy clothes blowing
in the wind.  The trial court could have reasonably put more weight on Whitus’s
first and more accurate estimate the night of the attack that her assailant
weighed approximately 180 pounds.

In addition, even though Whitus’s
description of Wooden’s complexion varied between “splotchy” and “freckled,” Whitus’s
description was still accurate in this respect when viewed in the appropriate
light.  See id.  Indeed, Whitus testified that she used the term
“freckles” on one occasion to describe an inconsistency or unevenness in her
assailant’s face.  The trial court could have interpreted this testimony to
indicate not that she was inconsistent in her description but merely that she
struggled with how to convey the physical characteristic that she had
observed.  As further evidence of reliability, the trial court had an
opportunity to review the photograph that Whitus later testified showed that
Wooden’s face was darker in some areas and lighter in others.

Turning to the fourth Biggers
factor, Whitus exhibited a high level of certainty when she selected Wooden’s
photograph at the confrontation.  See Luna, 268 S.W.3d at 605.  Both she
and Detective Randolph testified that she recognized her assailant instantly;
the only discrepancy between their testimonies was whether she pointed to
Wooden’s photograph at that moment or took additional time to carefully examine
each photograph.  Either way, viewing the evidence in the appropriate light, the
trial court could have found that this evidence supported a finding that Whitus
was highly confident in her identification of Wooden.  See Loserth, 963
S.W.2d at 773–74.  Finally, turning to the fifth factor, the length of time
between the April 24 robbery and the April 28 confrontation was four days,
which strengthened the reliability of Whitus’s identification.  See Manson
v. Brathwaite, 432 U.S. 98, 116, 97 S. Ct. 2243, 2253–54 (1977) (“The
photographic identification took place only two days later.  We do not have here the
passage of weeks or months between the crime and the viewing of the photograph.”).

In sum, we conclude that Wooden has
not shown by clear and convincing evidence that the photospread was impermissibly
suggestive, and the trial court could have reasonably found that each Biggers
factor weighed in favor of reliability even if the photospread was
impermissibly suggestive.  See Biggers, 409 U.S. at 199–200, 93 S. Ct.
at 382; Loserth, 963 S.W.2d at 773–74; Barley, 906 S.W.2d at
33–34.  Therefore, we hold that any suggestiveness did not deprive Wooden of
due process by giving rise to a very substantial likelihood of
misidentification, see Biggers, 409 U.S. at 199–200, 93 S. Ct. at 382; Conner,
67 S.W.3d at 200, and we overrule Wooden’s first and second points.

IV.  Accomplice Witness

In his third point, Wooden complains
that, absent the impermissibly suggestive photospread and the tainted in-court
identification, insufficient evidence existed to corroborate Wofford’s
accomplice testimony.  Wooden implicitly concedes that sufficient evidence
would exist if, as we have determined, the photospread was not impermissibly
suggestive and, thus, did not taint the in-court identification.  However, we will
still address the sufficiency in light of our decision on Wooden’s first two points. 
See Green v. State, No. 07-00-0586-CR, 2002 WL 31084674, at *2–3 (Tex.
App.—Amarillo Sept. 17, 2002, no pet.) (not designated for publication) (addressing
the accomplice testimony issue even though appellant only based this claim on
the alleged inadmissibility of the in-court identification, which the trial
court held to be admissible).

The code of criminal procedure
provides that a conviction cannot be based upon the testimony of an accomplice
unless other evidence tending to connect the defendant with the offense
corroborates the testimony.  Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005).
 “[N]on-accomplice evidence is sufficient corroboration if it shows that
rational jurors could have found that it sufficiently tended to connect the
accused to the offense.”  Smith v. State, 332 S.W.3d 425, 442 (Tex.
Crim. App. 2011) (“Therefore, it is not appropriate for appellate courts to
independently construe the non-accomplice evidence.”).

In addition to Whitus’s pretrial and
in-court identification of Wooden, corroborating Wofford’s testimony at trial
was Whitus’s testimony that, in the well lit parking lot, she got a “good look”
at her attacker, who she initially told police was an African American male who
stood over six feet tall, had a bushy hairdo, weighed about 180 pounds, had a
missing or rotten tooth, and had a splotchy complexion.  Also corroborating
Wofford’s testimony was evidence that Fort Worth police officers found Wooden
in the same house as the one from which they recovered Whitus’s identification
card.  The only contradicting evidence was
Whitus’s statement during a subsequent interview with police that her attacker
weighed about 200 pounds.  However, we must defer to the jury’s resolution of
this inconsistency and not independently construe the evidence.  See id. 
We conclude that rational jurors could have found that the combined weight of
the non-accomplice evidence—including Whitus’s almost instantaneous pretrial
identification, her in-court identification, the detailed description that she
gave to responding police officers, and the evidence that police found Wooden
and Whitus’s identification card in Wofford’s house—tended to connect Wooden to
the offense.  See id.  Thus, we overrule Wooden’s third point.

V.  Conclusion

          Having overruled all of Wooden’s
points, we affirm the trial court’s judgment.

 

                                                                   PER
CURIAM

 

PANEL:  MCCOY, DAUPHINOT, and
GARDNER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  December 8, 2011

 









[1]See Tex. R. App. P. 47.4.





[2]Whitus noted that it was hard to tell
exactly because he was wearing a large shirt and it was windy.





[3]The trial court also admitted a photograph
that, according to Whitus’s testimony, showed that Wooden’s face was lighter in
some areas and darker in others, and a photograph that showed that Wooden had a
missing tooth.





[4]During trial, Whitus testified that, because she recognized Wooden’s face,
she was able to identify him even though he had a different hair style in the photospread than she had originally
described.  Geleatha Mason, a
hairdresser, testified that
Wooden’s hair in the photospread was in “cornrows or braids” and estimated that it takes approximately twenty minutes to break
down cornrows such that the hair returns to an Afro style.





[5]After the trial court admitted Whitus’s
in-court identification, Whitus testified that, during her interview with
Detective Randolph, she described her assailant as weighing about 200 pounds,
having a “bushy Afro” and freckles, and missing a tooth.